## In re STERLING FOSTER & CO., INC., SECURITIES LITIGATION.

**This Document Relates To:**

**Thomas Rogers, et al., Plaintiffs,**

v.

**Sterling Foster & Co., Inc., et al., Defendants.**

**Leo W. Smith, et al., Plaintiffs,**

v.

**Sterling Foster & Co., Inc., et al., Defendants.**

**William V. Wright, et al., Plaintiffs,**

v.

**Sterling Foster & Co., Inc., et al., Defendants.**

**Michael Reynoso, et al., Plaintiffs,**

v.

**Sterling Foster & Co., Inc., et al., Defendants.**

**Andrew Petit, et al., Plaintiffs,**

v.

**Sterling Foster & Co., Inc., et al., Defendants.**

**Nos. 97 CV 189(ADS)(MLO), 97 CV 610(ADS)(MLO), 97 CV 1689(ADS)(MLO), 97 CV 3253(ADS)(MLO), 97 CV 3775(ADS)(MLO).**
**MDL No. 1208 (ADS)(MLO).**

United States District Court, E.D. New York.

June 27, 2002.

Milberg Weiss Bershad Hynes & Lerach, LLP, Robert A. Wallner, Esq., Kim Levy, Esq., Of Counsel, Goodkind Labaton Rudoff & Sucharow, LLP, Ira A. Schochet, Esq., Jonathan M. Plasse, Esq., James M. Strauss, Esq., Of Counsel, New York, NY, Co–Lead Counsel for the Plaintiffs.

Rathman & Francis, LLC, Steven J. Stolze, Esq., Of Counsel, St. Louis, MO, Co–Lead Counsel for Claims Against Advanced Voice Technologies, Inc., Com/Tech Communications Technologies, Inc. & Embryo Development Corporation.

Kirby McInerney & Squire, LLP, Peter S. Linden, Esq., Lewis S. Sandler, Esq., Of Counsel, New York, NY, Co–Lead Counsel for Claims Against Lasergate Systems, Inc. & ML Direct, Inc.

Law Offices of Joseph D'Elia, Joseph D'Elia, Esq., Of Counsel, Huntington, NY, Ungaretti & Harris, Miriam G. Bahcall, Esq., Rawn Howard Reinhard, Esq., Of Counsel, Chicago, IL, Counsel for Defendants Sterling Foster & Company, Inc., Adam Lieberman, Matthew Hawley and Robert J. Paulson.

Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., Edward M. Spiro, Esq., Of Counsel, New York, NY, Counsel for Defendant Randolph Pace.

Alan M. Novich, Montgomery, PA, Defendant Pro Se.

Choate, Hall & Stewart, Jeremiah T. O'Sullivan, Esq., John R. Baraniak, Jr., Esq., Of Counsel, Boston, MA, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, LLP, Lisa A. Cahill, Esq., Of Counsel, New York, NY, Counsel for Defendants Com/Tech Communication Technologies, Inc., ML Direct, Inc., and Nancy G. Shalek.

Bondy & Schloss, LLP, Joel M. Wolosky, Esq., Of Counsel, New York, NY, Counsel for Defendant Lasergate Systems, Inc.

Arnold & Porter, Peter L. Zimroth, Esq., David A. Weintraub, Esq., Of Counsel, New York, NY, Stephen M. Sacks, Esq., Scott B. Schreiber, Esq., James L. Cooper, Esq., Of Counsel, Washington, DC, Counsel for Defendants Bear, Stearns & Co., Inc., and Bear, Stearns Securities Corp.

Katten Muchin Zavis Rosenman, Howard Wilson, Esq., Joseph Zuckerman,

Esq., Of Counsel, New York, NY, Counsel for Defendant Richard Harriton.

Carey & Associates, Michael Q. Carey, Esq., Miriam A. Widmann, Esq., Of Counsel, New York, NY, Counsel for Defendants Roger Buoy, Tony Swash, Terence McAuley, and Armando Araujo.

Stillman & Friedman, P.C., Charles A. Stillman, Esq., Of Counsel, New York, NY, Counsel for Defendant Michael Krasnoff.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

### TABLE OF CONTENTS

I. Background .................................................................225
 A. The Procedural Nature of the Case .....................................225
 B. The Second Amended and Consolidated Class Action Complaint ..............227
 1. The Overall Scheme..............................................227
 2. The Allegations of the Six Putative Subclasses .........................230
 a. The Allegations of the Advanced Voice Subclass.....................230
 b. The Allegations of the Com/Tech Subclass..........................233
 c. The Allegations of the Embryo Subclass ...........................235
 d. The Allegations of the Applewoods Subclass ........................237
 e. The Allegations of the Lasergate Subclass .........................239
 f. The Allegations of the ML Direct Subclass .........................241
 3. Claim Thirty–One ...............................................242

II. Discussion................................................................242
 A. The Motions to Dismiss the Second Amended Complaint ...................243
 1. Standing ......................................................243
 2. The Statute of Limitations ........................................248
 a. The Sterling Foster Defendants and the Shalek Defendants ..........249
 b. Bear Stearns and BSSC .........................................250
 c. Randolph Pace .................................................254
 d. Applewoods ....................................................257
 e. The Individual Applewoods Defendants ............................259
 3. The Claims Brought Pursuant to Section 11 of the Securities Act .........262
 a. The Alleged Omissions are Not Immaterial.........................262
 b. Reliance ......................................................266
 c. Oral Misrepresentations ........................................267
 d. The Section 11 Claims are Pled With Sufficient Particularity ........267
 4. The Claims Brought Pursuant to Section 10(b) of the Exchange Act
 and Rule 10b–5 Promulgated Thereunder ...........................268
 a. Scienter ......................................................270
 b. Loss Causation and Reliance ....................................274
 5. Pleading Fraud With Particularity ..................................278
 6. Control Person Liability ..........................................282
 7. Supplemental Jurisdiction ........................................283
 8. Negligent Misrepresentation ......................................283
 9. The Section 349 Claims ..........................................285
 B. The Motions for a Temporary Stay of the Action Pending Resolution of
 Parallel Criminal Proceedings.........................................287
 C. The Motion to Lift the Automatic Stay of Discovery .......................288

III. Conclusion ...............................................................288

On February 17, 1999, the plaintiffs filed the Second Amended and Consolidated Class Action Complaint ("Second Amended Complaint"), which alleges that the defendants violated Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities

Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), as well as Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. In addition, the Second Amended Complaint raises claims under New York State law for negligent misrepresentation, common law fraud, and violations of Section 349 of the New York General Business Law ("N.Y.Gen.Bus.L."). The present decision addresses nine motions to dismiss the Second Amended Complaint, four motions to stay the action, and one motion to lift the automatic stay of discovery.

## I. BACKGROUND

### A. The Procedural Nature of the Case

Before describing the allegations contained in the Second Amended Complaint, it is important to review the procedural nature of this complex action. The present case is a consolidation of five separate actions: *Rogers, et al. v. Sterling Foster & Co., Inc., et al.,* 97 CV 189; *Smith, et al. v. Sterling Foster & Co., Inc., et al.,* 97 CV 610; *Wright v. Sterling Foster & Co., Inc., et. al.,* 97 CV 1689; *Reynoso v. Sterling Foster, Inc.,* 97 CV 3253; and *Petit v. Sterling Foster & Co., Inc., et al.,* 97 CV 3775. When these separate actions were commenced in 1997, they were assigned to the Hon. Dennis R. Hurley in the Eastern District of New York. In an order dated October 27, 1997, Judge Hurley consolidated the cases under Civil Action No. 97–189 and appointed lead plaintiffs and counsel.

Two days later, on October 29, 1997, Judge Hurley issued an order (1) enjoining all arbitrations pending against Sterling Foster through December 15, 1997; (2) directing the plaintiffs to file a Consolidated Class Action Complaint by November 27, 1997; and (3) directing Sterling Foster & Co., Inc. ("Sterling Foster") to serve a notice and a copy of the amended complaint on all arbitration claimants, advising the claimants that in order to proceed with their arbitration claims against Sterling Foster, they must file a request to be excluded from the putative class action within 45 days, and that if they failed to file a timely request for an exclusion, their arbitrations would be stayed.

On December 1, 1997, the plaintiffs filed an Amended and Consolidated Class Action Complaint. Thereafter, in an order dated December 8, 1997, Judge Hurley approved the notice to be sent to the arbitration claimants, informing them of the pendency of the consolidated class action proceedings and their right to request early exclusion and to pursue arbitration. Judge Hurley specifically directed that once a party requests early exclusion from the consolidated class action proceedings, the Court's October 29, 1997 order enjoining arbitration will no longer apply to the excluded party's case, and that individual may proceed with arbitration immediately. Conversely, if a party did not request early exclusion, the party would be enjoined from proceeding with arbitration.

In an order dated February 18, 1998, the Judicial Panel on Multidistrict Litigation ("J.P.M.L.") granted a motion by Sterling Foster to centralize the following actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings in the Eastern District of New York: *Rogers, et al. v. Sterling Foster & Co., Inc.,* 97 CV 189 (consolidated with, Civil Action Nos. 97 CV 610, 97 CV 1689, 97 CV 3253, and 97 CV 3775); *Umbriac v. Sterling Foster & Co., Inc., et al.,* 98 CV 1469 (from M.D. Pa., 97 CV 1290); *Mott v. Sterling Foster & Co., Inc., et al.,* 98 CV 1471 (from E.D. Tex., 97 CV 201); and *Price v. Sterling Foster & Co., Inc., et al.,* 97 CV 1470 (from D.S.C., 97 CV 1082). The J.P.M.L. transferred *Umbriac, Mott,* and *Price* to the Eastern District of New

York, and assigned the Multidistrict Litigation to this Court.

In an order dated February 26, 1998, the J.P.M.L. transferred two tag-along cases to this Court pursuant to Rule 12 of the Rules of Procedure of the J.P.M.L.: *Farida v. Sterling Foster & Co., Inc., et al.*, 98 CV 2290 (from E.D. Mich. 96 CV 70843); and *Braymen, et al., v. Sterling Foster, Inc., et al.*, 98 CV 2291 (from E.D. Mo., 97 CV 2066). On April 22, 1999, the J.P.M.L., transferred the following tag-along cases to this Court: *Greenberg v. Bear Stearns & Co., Inc., et al.*, 99 CV 2788 (from S.D.N.Y. 99 CV 359); and *Levitt, et al. v. Bear Stearns & Co., Inc., et al.*, 99 CV 2789 (from S.D.N.Y. 99 CV 1115). The J.P.M.L. transferred *Lund v. Sterling Foster & Co., Inc., et al.*, 99 MC 111 (from W.D. Wis. 97 CV 238), and *Mihalevich, et al. v. Bear, Stearns & Co., et al.*, 99 CV 5012 (from W.D. Mo. 99 CV 126), to this Court on June 4, and July 28, 1999 respectively.

On June 7, 1999, following the registration of a foreign judgment, the *Lund* case, 99 MC 111, was closed. On October 21, 1999, the plaintiffs in *Mihalevich*, 99 CV 5012, voluntarily dismissed the action, and that case was closed. In a decision and order dated January 26, 2000, this Court dismissed *Greenberg*, 99 CV 2788.

Accordingly, *In re Sterling Foster & Co., Inc., Sec. Litig.*, MDL No. 1208 consists of eleven cases: the five that are consolidated under Civil Action No. 97–189 (*Rogers*); *Umbriac*, 98 CV 1469; *Price*, 98 CV 1470; *Mott*, 98 CV 1471; *Farida*, 98 CV 2290; *Braymen*, 98 CV 2291; and *Levitt*, 99 CV 2789. On February 17, 1999, the plaintiffs in *Rogers* filed the Second Amended Complaint pursuant to a Court order granting them leave to do so. As noted above, the defendants in *Rogers* have filed nine motions to dismiss the Second Amended Complaint and four motions to stay the action pending the resolution of criminal proceedings. In addition, the plaintiffs have a motion to lift the automatic stay of discovery. The defendants in *Levitt*, 99 CV 2789, have filed a motion to dismiss that action, which the Court will address in a separate decision. The defendants in *Price*, 98 CV 1470, filed two motions to dismiss the complaint when the case was pending in the Eastern District of Texas. However, the case was transferred before the Eastern District of Texas had the opportunity to address the motions. Accordingly, this Court will decide the motions in a separate decision. The decisions in *Levitt* and *Price* bear the same date as the date of this decision.

There are no motions pending in *Umbriac*, 98 CV 1469, *Mott*, 98 CV 1471, *Farida*, 98 CV 2290, or *Braymen*, 98 CV 2291, and there has been no activity in these four cases since March 21, 2000, October 27, 1998, October 27, 1998, and October 20, 1998, respectively. The Court will issue a decision in each of those cases, and those decisions also bear the date that appears on this decision.

In an order dated December 18, 2000, this Court granted the unopposed motion of defendants Bear, Stearns & Co., Inc. ("Bear Stearns"); Bear, Stearns Securities Corp. ("BSSC") (collectively, the "Bear Stearns Defendants"), and Richard Harriton ("Harriton") to enjoin the arbitrations that had been filed against them by putative class members in *Rogers*, 97 CV 189. Similar to Judge Hurley's October 29, 1997 order, this directed the Bear Stearns Defendants and Harriton to provide the arbitration claimants with notice of the pending class actions and a copy of the Second Amended and Consolidated Class Action Complaint. The order further directed the Bear Stearns Defendants and Harriton to advise the claimants that if they wished to proceed with their arbitrations, they must file a request to be excluded from the

putative class action within 45 days, and that if a claimant chose not to withdraw from the putative class or failed to do so in a timely fashion, his or her arbitration would be stayed.

### B. The Second Amended and Consolidated Class Action Complaint

The facts contained in this decision are taken from the complaint and are accepted as true for the purposes of the present motions. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999); *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998). The Second Amended Complaint is organized as follows: (1) it describes the overall scheme to defraud; (2) it sets forth allegations according to the six proposed subclasses of plaintiffs, each of which consists of purchasers of securities issued by one of the six defendant companies'; and (3) it contains 31 claims for relief, which are broken down into one set of five claims for each subclass plus one claim that pertains to the entire plaintiff class.

#### 1. The Overall Scheme

The claims in this case arise from the public offerings of six companies: Advanced Voice Technologies, Inc. ("Advanced Voice"), Com/Tech Communication Technologies, Inc. ("Com/Tech"); Embryo Development Corporation ("Embryo"); Applewoods, Inc. ("Applewoods"); Lasergate Systems, Inc. ("Lasergate") (collectively, the "Issuer Defendants"); and ML Direct, Inc. ("ML Direct") (collectively, the "defendant companies"). Sterling Foster, a registered broker-dealer and a member of the National Association of Securities Dealers, Inc., ("NASD") underwrote the offerings for each company except ML Direct, whose offering was underwritten by a different investment bank, Patterson Travis, Inc. ("Patterson Travis"). The public offerings of Advanced Voice, Com/Tech, Embryo, Applewoods, and ML Direct were

initial public offerings ("IPO"), while the Lasergate offering was a secondary offering.

Prior to each offering, certain company insiders and principal stockholders ("Selling Securityholders") purchased a substantial amount of stock, sometimes almost as much as was being offered to the public, in each of the defendant companies. One of the Selling Securityholders in the Advanced Voice, Com/Tech, Embryo, Applewoods, and ML Direct offerings was a company called "M.D. Funding", which was controlled by defendant Michael Krasnoff ("Krasnoff"). The Selling Securityholders purchase their stock for no more than $1.00 per share while the same securities were being offered to the public for roughly $5.00 per share. Most of the Selling Securityholders agreed not to sell their shares for at least one year following the offering unless they received written permission from Sterling Foster to do so. These "lock-up agreements" were disclosed in the Issuer Defendants' prospectuses.

However, Sterling Foster, Adam Lieberman ("Lieberman"), the company's president; Randolph Pace ("Pace"), the individual who is alleged to have secretly controlled the company; and Alan Novich ("Novich"), an attorney, entered into secret agreements with the Selling Securityholders. According to these undisclosed arrangements, shortly after the registration statements of the defendant companies became effective, Sterling Foster would release the Selling Securityholders from their lock-up agreements and would purchase the Selling Securityholders' shares at prices ranging from $1.50 to approximately $3.00 per share in order to cover a short position Sterling Foster intended to assume in the aftermarket. The plaintiff alleges that the prospectuses and registration statements distributed by

Sterling Foster, Lieberman, Pace, and Novich were materially false and misleading because although they registered the shelf shares and lock-up agreements, they failed to disclose the secret arrangements between the Selling Securityholders and Sterling Foster. According to the plaintiffs, Sterling Foster customers purchased their securities in the defendant companies without the knowledge that Sterling Foster would release the Selling Securityholders from their lock-up agreements and purchase the shelf shares at deeply discounted prices.

In regard to the offerings themselves, the Second Amended Complaint does not specifically allege which plaintiffs purchased shares in an IPO as opposed to in the aftermarket. However, the Second Amended Complaint does set forth the dates on which the plaintiffs purchased their respective shares, and one could infer from that information that some plaintiffs might have purchased shares in the initial offering.

In any event, the Second Amended Complaint asserts that when the registration statements of the defendant companies became effective, and perhaps prior to those dates, Sterling Foster's sales force of 150 registered representatives, including defendants Matthew Hawley ("Hawley") and Robert J. Paulson ("Paulson"), engaged in a massive and aggressive selling campaign designed to artificially inflate the price of the defendant companies' stock through the use of, among other things, "boiler room" sales practices. Hawley, Paulson, and Sterling Foster's other registered representatives told potential customers that: (1) the stocks underwritten by Sterling Foster were "oversubscribed" because so many investors were interested in purchasing the stocks; (2) large institutions were about to buy large blocks of the stock; and (3) the stock being sold was going to reach a target price within a matter of days. The Second Amended Complaint designates a "Broker Class" consisting of Sterling Foster registered representatives who sold securities. Hawley and Paulson are sued individually and as representatives of the Broker Class. Since the Broker Class has not been certified, this decision does not refer to claims as being brought against the Broker Class but, rather, as being brought against Hawley and Paulson as representatives of the Broker Class.

The plaintiffs also allege that Sterling Foster, Lieberman, Hawley, Paulson, and the other registered representatives failed to provide the plaintiffs with copies of the prospectuses for the Issuer Defendants; led the plaintiffs to believe that they were purchasing securities in an initial public offering, when in fact the plaintiffs were purchasing the securities in the aftermarket at substantially higher prices; concealed excessive mark-ups that the defendants were receiving for the sale of shares; and misrepresented that the offering price was the purchase price. Sterling Foster also discouraged its customers from selling their shares by telling them that such action would cause the price of the shares to decline. At times, Sterling Foster failed to effect or avoided effecting sell orders and told its registered representatives that if they wanted to keep their commissions, they must prevent their customers from selling the securities for at least 30 days. Sterling Foster itself purchased a substantial number of securities on the open market shortly after each defendant company's offering, thereby decreasing the number of shares available to the public.

The Second Amended Complaint further asserts that the defendants' sales practices were fraudulent, deceptive, manipulative, and designed to inflate the price of the defendant companies' securities. The plaintiffs also allege that the sales campaign,

together with the purchases made by Sterling Foster diminished the supply and increased the demand for the securities thus causing a dramatic rise in the price of each stock. The plaintiffs allege that the increased prices of the securities were not tied to a change in the underlying business operations or the corporate developments of the defendant companies.

When the share price and demand reached certain levels, Sterling Foster satisfied the demand it had created by selling shares to the public at the prices it had artificially inflated. Sterling Foster often sold shares it did not own and, in some situations, sold twice the number of securities that had been sold to the public in the offering. By selling shares it did not own, Sterling Foster assumed huge "short" positions in each of the defendant companies' stock.

Sterling Foster covered its short positions by releasing the Selling Securityholders from their lock-up agreements and purchasing their shelf shares at prices ranging from $1.50 to $3.00 per share, as per the terms of the secret agreements. As Sterling Foster covered its short positions with the deeply discounted shelf shares from the Selling Securityholders, the company realized profits of tens of millions of dollars. The Selling Securityholders also reaped millions of dollars in profits. Conversely, the flood of the shelf shares on the market caused the share price to drop to levels well below the offering prices, and the plaintiffs lost the value of their investments.

Meanwhile, BSSC was serving as Sterling Foster's clearing broker. Defendant Harriton was the Senior Managing Director of BSSC and had been friends with defendant Pace since the late 1980s. The plaintiffs claim that Pace's friendship with Harriton prompted Sterling Foster to hire BSSC to clear its trades. Bear Stearns was the sole owner of BSSC.

The plaintiffs contend that BSSC "leased out" its name to Sterling Foster in order to lend the brokerage house credibility and in exchange for the ability to reap great profits. The Second Amended Complaint also alleges that the Bear Stearns Defendants and Harriton knew that the statements contained in the defendant companies' prospectuses and registration statements were false, misleading and intended to deceive the plaintiffs. The plaintiffs also claim that the Bear Stearns Defendants and Harriton acted with reckless disregard for the truth when they failed to disclose or cause the disclosure of the truth to the plaintiffs.

The Bear Stearns Defendants and Harriton were not named in the original complaint, filed on January 15, 1997, or in the Amended and Consolidated Class Action Complaint filed on December 1, 1997. The plaintiffs added the Bear Stearns Defendants and Harriton to the action when they filed the Second Amended Complaint on February 17, 1999.

The complaint also contains allegations regarding Bartley T. Bernstein, Esq. ("Bernstein"), Steven F. Wasserman, Esq. ("Wasserman"), and Bernstein & Wasserman, LLP ("Bernstein & Wasserman") (collectively, the "attorney defendants"), who purportedly participated in the preparation of the prospectuses and registration statements in all of the public offerings except that for Lasergate. However, in a letter dated January 13, 2000, the parties advised the Court that they had entered into a Memorandum of Understanding settling the action with regard to the attorney defendants. Therefore, although the attorney defendants are mentioned in the complaint and at least one of them is named as a defendant in Claim Nos. 1, 13, 25, 2, 14, 26, 3, 15, 27, 4, 16, 28, 18, and 30, this decision does not refer to them.

On October 8, 1996, the *Bloomberg Newswire* reported that the NASD had filed a complaint against Sterling Foster, charging the brokerage firm with netting $53 million in illegal profits from the IPOs for Advanced Voice, Com/Tech, and Embryo. The article states that the NASD accused Sterling Foster of inflating prices of three stocks it sold to thousands of customers and obtaining a virtual monopoly on trading by purchasing shares at discount prices from company insiders. The *Bloomberg Newswire* article also describes the boiler-room sales practices allegedly employed by the Sterling Foster sales force. The article states that the NASD complaint charges Sterling Foster brokers with falsely telling customers that the companies had been featured on the television show, "60–Minutes," and that the IPO price was $12.75 per share when it actually was $5.50 per share.

The following day, October 9, 1996, *The Wall Street Journal* ran an article entitled, *Sterling Foster Charged by NASD for Illicit Trading*, which began by stating "In one of its largest cases in recent years, the regulatory arm of the National Association of Securities Dealers alleged in a disciplinary proceeding that Sterling Foster & Co. and 15 of its officials, supervisors or brokers made $53 million in illicit profits from improper underwritings, manipulative trading and high-pressure 'boiler room' sales practices." Deborah Lohse, *Sterling Foster Charged by NASD for Illicit Trading*, The Wall Street Journal, Oct. 9, 1996, at A15. The article states that the allegations in the complaint center on the alleged manipulations of the Advanced Voice, Com/Tech, and Embryo IPOs. The author states that the NASD alleged that Sterling Foster established huge short positions which they covered by buying the shares from company insiders at tremendous discounts and pursuant to previous agreements.

Approximately two years later, *The Wall Street Journal* reported that Pace had been "indicted on charges he masterminded a $100 million fraud scheme by small-stock firm Sterling Foster & Co. by manipulating public offerings." Frances A. McMorris, *Former Owner of Rooney Pace Indicted in Fraud*, The Wall Street Journal, Nov. 10, 1998, at B12. The article explains that Pace and Novich allegedly defrauded investors who purchased stock in the fraudulent IPOs of Embryo, Lasergate, Advanced Voice, Com/Tech, Applewoods, and ML Direct. According to the article, Pace secured capital for Sterling Foster and established the clearing agreement with BSSC in exchange for control over the underwriter's business activities and a cut of its net profits. The article states that Pace's assistance was secret because when the Sterling Foster scheme began in 1994, Pace had been suspended from acting as a principal with any NASD firm.

### 2. The Allegations of the Six Putative Subclasses

Following the description of the overall fraudulent scheme that is set forth above, the complaint contains the allegations of the six putative subclasses. As mentioned above, each subclass corresponds to one of the six defendant companies and consists of individuals who purchased the securities of that company. The claims raised by the subclasses against the defendants parallel one another, but the facts underlying these claims differ slightly from one subclass to the next. Therefore, the Court finds it important to set forth the factual allegations and legal claims of each subclass.

### a. The Allegations of the Advanced Voice Subclass

The Advanced Voice Subclass consists of individuals who purchased Advanced Voice

securities during the period commencing on February 6, 1995, the date on which the Advanced Voice registration statement became effective, and terminating on October 8, 1996, the date on which the *Bloomberg Newswire* reported that the NASD had charged Sterling Foster with securities fraud in connection with the Advanced Voice IPO. The lead plaintiffs of the Advanced Voice Subclass are William Wright ("Wright"), Michael Reynoso ("Reynoso"), and Michael A. Lepera ("Lepera"), who purchased Advanced Voice securities as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Wright | 2000 | 10/3/96 | 7½ |
| Reynoso | 500 | 9/96 | 13⅛ |
| Lepera | 2000 | 10/15/95 | 5 |

The additional plaintiffs include Douglas and Susan Morehead (the "Moreheads"), Ali Soliman ("Soliman"), and Jeffrey Stauffer ("Stauffer"), who purchased Advanced Voice securities as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Moreheads | 5000 warrants | 2/7/95 | 7½ |
| | 2000 units | 2/7/95 | 7½ |
| | 1000 | 2/7/95 | 14 |
| Soliman | 1400 warrants | 7/30/96 | 7¼ |
| | 1800 | 9/4/96 | 14½ |
| Stauffer | 3000 warrants | 7/19/95 | 3¾ |

The Advanced Voice Subclass contends that their shares are traceable to the Advanced Voice registration statement and prospectus.

Advanced Voice developed custom hardware and software applications that would support the early stages of the voice processing industry. Defendant Nancy Shalek ("Shalek") was the Chairperson of the Board of Directors for Advanced Voice. Prior to the public offering, Shalek and her husband each owned 9.9% of the company. The plaintiffs allege that Shalek was a "controlling person" of the company within the meaning of the Securities Act, 15 U.S.C. § 77o, and the Exchange Act, 15 U.S.C. § 78t(a).

The Advanced Voice offering prospectus and registration statement declares that the company would issue 1,000,000 units (one share of common stock and one Class A redeemable common stock purchase warrant) at $5.50 per unit. The prospectus also registered 1,519,756 shares of common stock that had been issued to Selling Securityholders prior to February 6, 1995 and were not part of the IPO.

The prospectus states that the Selling Securityholders had agreed to "lock-up" periods during which they would not sell their shares "without [Sterling Foster's] prior written consent" for a period of 24 months from the effective date, except for certain Selling Securityholders who agreed to a 13–month period (Advanced Voice Prospectus, p. 41). The prospectus also provides that Sterling Foster had advised Advanced Voice "that it would consider releasing the lockup ... based upon the facts and circumstances at the time of the request to release the lockup, including but not limited to, general market conditions, the price of the Company's securities, the liquidity of the trading market, and ... the financial needs of the company" (Advanced Voice Prospectus, p. 41). If the Selling Securityholders resold their securities, such resale was "subject to Prospectus delivery and other requirements of the [Securities] Act" (Advanced Voice Prospectus, p. 38). Shalek signed the registration statement, which includes the offering prospectus, and Sterling Foster, Lieberman, Novich, Pace, Advanced Voice, and Shalek were responsible for disseminating the documents.

The subclass claims that the prospectus failed to include the secret agreements between Sterling Foster and the Advanced Voice Selling Securityholders by which Sterling Foster would release the Selling

Securityholders from their lock-up agreements and purchase their shares in the aftermarket at a substantial discount to the prevailing market price in order to cover a huge short position Sterling Foster intended to establish.

The registration statement became effective on February 6, 1995, and trading in Advance Voice stock commenced the following day. Sterling Foster and 13 other broker-dealers distributed the 1,000,000 units to customers at a price of $5.50 per unit. Sterling Foster sold 74% of the offering to its own customers. Lieberman personally sold units to 35 customers at $5.50 per unit. Five minutes after aftermarket trading began, 33 of those customers sold their units back to Sterling Foster at $12.875 per unit. Shalek and her husband also sold their interest in the company.

In one nine-minute period of trading, Sterling Foster executed 958 order tickets for retail customers who purchased a total of 2,355,085 shares of Advanced Voice common stock at prices ranging from $12.25 to $12.75 per share. Sterling Foster solicited purchasers for all of these shares by using their sales force to "cold call" potential customers prior to the opening of aftermarket trading. During these telephone conversations, Sterling Foster's brokers made baseless predictions of a substantial and immediate rise in the aftermarket price of the securities. The brokers also employed tie ins and wooden tickets, two additional "boiler room" tactics, during aftermarket trading. Tie ins require customers who receive units in the IPO to make purchases in the aftermarket, and wooden tickets are simply unauthorized purchases.

At the close of trading on February 7, 1996, Sterling Foster was short 2,120,560 shares of Advanced Voice common stock, which closed at $13.50 per share. Sterling Foster's short position was more than twice the amount of the offering and was valued at $26,627,560, a sum that was more than ten times the firm's net capital at the time.

During the first two days of trading, Sterling Foster's sale of Advanced Voice stock accounted for 91% of the total sale volume in the common stock. During the first month of trading, Sterling Foster accounted for over 83% of all the total retail purchase volume and over 79% of the total sale volume in Advanced Voice common stock.

A Sterling Foster broker earned $1.75 per share when a customer purchased stock but only $.10 per share when the customer sold stock. Sterling Foster also penalized those registered representatives who permitted retail customers to sell their securities in the aftermarket by removing accounts and commissions the brokers had earned previously.

In order to cover its short, Sterling Foster released the Advanced Voice Selling Securityholders from their lock-up agreements and purchased the 1,519,756 shelf shares at $2.00 per share, which was a huge discount to the prevailing market price. The plaintiffs allege that Sterling Foster's release and subsequent purchase of the shelf shares was done pursuant to the pre-existing secret agreement among Advanced Voice, Shalek, Sterling Foster, Lieberman, Pace, and Novich. Sterling Foster's purchases of the Selling Securityholders' shares were not disclosed to the investing public except for a single SEC Form 4 filed for Shalek and her husband on March 10, 1995. BSSC did not clear the Selling Securityholders' transactions.

The Advanced Voice Subclass raises five claims against the defendants. None of these claims lists Advanced Voice as a defendant, because the company is in bankruptcy, and the action against it has been automatically stayed pursuant to 11

U.S.C. § 362(a). Claim one alleges that Shalek, Sterling Foster, Lieberman, Pace, Novich, and Krasnoff violated Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, by signing and disseminating the Advanced Voice registration statement and prospectus which "contained untrue statements of material facts [and] omitted to state other facts necessary to make the statements made not misleading" (complaint ¶ 176).

Claim seven alleges that Shalek, Lieberman, Pace, Novich, Hawley, and Paulson violated Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77o.

In claim thirteen, the Advanced Voice Subclass alleges that Shalek, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by manipulating the market for Advanced Voice securities to artificially inflate the price of the company's stock in order to defraud the Advanced Voice Subclass in connection with the purchase of Advanced Voice securities. The Advanced Voice subclass also alleges that the defendants made false statements or omitted material facts upon which the subclass relied and which caused them to suffer injury. The Advanced Voice Subclass maintains that its members were unaware of the market manipulation, false statements, and material omissions when they purchased shares of Advanced Voice, and had they been aware of the defendants' conduct, they would not have purchased the securities at the artificially inflated prices.

Claim nineteen alleges that Shalek, Sterling Foster, Lieberman, Hawley, and Paulson made negligent misrepresentations of fact to the subclass, and claim twenty-five alleges that Shalek, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Section 349 of the New York General Business Law.

### b. The Allegations of the Com/Tech Subclass

The Com/Tech Subclass consists of individuals who purchased Com/Tech securities during the period commencing on August 23, 1995, the date on which the Com/Tech registration statement became effective, and terminating on October 8, 1996, the date on which the *Bloomberg Newswire* reported that the NASD had charged Sterling Foster with securities fraud. The lead plaintiffs of the Com/Tech Subclass are Reynoso and Andrew Petit ("Petit"), who purchased Com/Tech securities as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
| --- | --- | --- | --- |
| Reynoso | 3000 | 12/95 | 8⅛ |
| Petit | 5000 | 8/24/95 | 9¾ |
| 000 | 12/18/95 | 7½ | |

The additional plaintiffs include William Kent ("Kent"), William Maxey ("Maxey"), David Valentine ("Valentine"), Control Touch Systems, Inc., ("Control Touch"), Stauffer, and Mayer Gross ("Gross"), who purchased Com/Tech securities as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
| --- | --- | --- | --- |
| Kent | 500 | 8/23/95 | 9¾ |
| Maxey | 1000 | 9/6/95 | 10½ |
| | 1000 | 9/14/95 | 10 |
| | 2000 | 12/18/95 | 7½ |
| Valentine | 1000 | 8/24/95 | 9⅝ |
| Control Touch | 10,000 | 6/25/96 | 5⅜₁₆ |
| Stauffer | 2500 | 8/28/95 | 9¾ |
| | 4500 | 8/23/95 | 9¾ |
| Gross | 300 | 8/24/95 | 9¾ |
| | 700 | 9/14/95 | 9¾ |

The Com/Tech Subclass contends that their shares of Com/Tech are traceable to

the Com/Tech registration statement and prospectus.

Com/Tech developed interactive video programming and designs and managed private satellite networks that delivered one-way or interactive video programs and video teleconferencing to geographically dispersed places. Shalek was the Chairperson of the Board, the Chief Financial Officer ("CFO"), and the Secretary of Com/Tech. Prior to the public offering, Shalek owned 9.8% of the company while her husband controlled 50,000 shares. The plaintiffs allege that Shalek was a "controlling person" of the company within the meaning of the Securities Act, 15 U.S.C. § 77o, and the Exchange Act, 15 U.S.C. § 78t(a).

The Com/Tech offering prospectus and registration statement declares that the company would issue 1,000,000 shares at the offering price of $5.00 per share. The prospectus also registered 1,360,000 shares of common stock that had been issued to Selling Securityholders prior to August 23, 1995, and were not part of the IPO. Defendant Krasnoff owned shares of Com/Tech as a Selling Securityholder.

The prospectus states that the Selling Securityholders had agreed to "lock-up" periods, which meant that they would not sell their pre-offering shares for a period of 24 months from the effective date, except for certain Selling Securityholders who had agreed to a 13–month period. The prospectus also states that the shares owned by the Selling Securityholders were "subject to earlier release by [Sterling Foster]," which must be in writing (Com/Tech Prospectus, pp. 35, 38). The prospectus further provides that if the Selling Securityholders resold their shares, the resale was "subject to Prospectus delivery and other requirements of the Securities Act of 1933" (Com/Tech Prospectus, cover, p. 35). Shalek signed the registration statement, which includes the offering prospectus, and Com/Tech, Shalek, Sterling Foster, Lieberman, Pace, and Novich disseminated the registration statement and prospectus.

The plaintiffs contend that the registration statement and prospectus contained misstatements and material omissions because they did not indicate that Sterling Foster and the Selling Securityholders had already agreed that Sterling Foster would release the Selling Securityholders from their lock-up agreements and would purchase their shares at a substantial discount to the prevailing market price in order to cover a huge short position Sterling Foster intended to establish shortly after trading commenced.

The registration statement became effective on August 23, 1995, and trading in Com/Tech's stock began the following day. On August 24, 1995, Sterling Foster accounted for approximately 90% of the total purchase and sale volume in Com/Tech. The brokerage house ended the first day of trading the net retail seller of approximately 2,000,000 shares of Com/Tech stock, which closed at $10.125. Sterling Foster's short position was more than twice Com/Tech's public float and was valued at over $20,000,000. As per the preexisting secret agreements, Sterling Foster, acting through Lieberman, covered its short by releasing the Selling Securityholders from their lock-up agreements and purchasing their shares at a substantial discount to the prevailing market price.

From August 23, 1995 through October 8, 1996, Sterling Foster, acting through Lieberman, Pace, Novich, "and others" restricted the supply of Com/Tech securities available for trading, which enabled these defendants to establish and maintain arbitrary and artificially high prices in the aftermarket. To this end, Sterling Foster, among other things, placed approximately

74% of the Com/Tech offering with its own customers.

The Com/Tech Subclass raises five claims against the defendants. In claim two, the Com/Tech subclass alleges that Com/Tech, Shalek, Sterling Foster, Lieberman, Pace, Novich, and Krasnoff violated Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, because Com/Tech's registration statement and prospectus contained untrue statements of material facts and omitted other facts necessary to make the statements made not misleading. Claim eight alleges that Com/Tech, Shalek, Sterling Foster, Lieberman, Pace, Novich, Hawley, and Paulson violated Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77o.

In claim fourteen, the Com/Tech Subclass alleges that Com/Tech, Shalek, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b–5, 17 C.F.R. § 240.10b–5 by manipulating the market for Com/Tech securities thereby artificially inflating the price of the stock and defrauding the Com/Tech Subclass in connection with their purchase of the securities. The Com/Tech Subclass also alleges that the defendants made false statements or omitted material facts upon which the subclass relied and which caused them to suffer injury. The Com/Tech Subclass further maintains that its members were unaware of the market manipulation when they purchased the Com/Tech stock, and had they been aware of the scheme, the would not have purchased Com/Tech at the artificially inflated prices.

Claim twenty alleges that Com/Tech, Shalek, Sterling Foster, Lieberman, Hawley, and Paulson made negligent misrepresentations to the Com/Tech Subclass, and claim twenty-six alleges that Com/Tech, Shalek, Sterling Foster, Lieberman, Haw-

ley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Section 349 of the N.Y. Gen. Bus. L.

### c. The Allegations of the Embryo Subclass

The Embryo Subclass consists of individuals who purchased Embryo securities during the period commencing on November 17, 1995, the date on which the Embryo registration statement became effective, and terminating on October 8, 1996, the date on which the *Bloomberg Newswire* reported that the NASD had charged Sterling Foster with securities fraud. The lead plaintiffs of the Embryo Subclass are Thomas Rogers ("Rogers"), Marie Garrett ("Garrett"), Reynoso, Petit, and Lepera, who purchased shares as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Rogers | 500 | 11/17/95 | 9½ |
| | 500 | 12/11/95 | 13¼ |
| | 1000 | 2/2/96 | 7⅞ |
| | 1500 | 2/14/96 | 7½ |
| Reynoso | 4000 | 12/95 | 9⅞ |
| | 1000 | 12/95 | 11½ |
| | 1000 | 12/95 | 13 |
| | 4000 | 2/96 | 7¾ |
| Petit | 5000 | 11/17/95 | 5 |
| | 17,500 | 11/17/95 | 9⅞ |
| Lepera | 1000 | 11/17/95 | 9⅞ |

The additional plaintiffs include Maxey, Andres Montejo ("Montejo"), David Black ("Black"), and Leo A. Smith ("Smith"), who purchased shares as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Maxey | 1000 | 11/17/95 | 9⅞ |
| | 3000 | 2/7/95 | 13 |

| | | | |
|---|---|---|---|
| Montejo & Black | 30,000 | 6/24/96 | 6 |
| Smith | 500 | 11/17/95 | 5 |
| | 1200 | 4/1/96 | 6⅛ |

The Embryo Subclass contends that their shares of Embryo are traceable to the Embryo registration statement and prospectus.

Embryo developed, acquired, manufactured, and marketed various bio-medical devices. Michael Lulkin ("Lulkin") was the Chairman of the Board of Directors and the Secretary. Prior to the offering, he owned or controlled 7.1% of the company. The plaintiffs allege that Lulkin was a "controlling person" of Embryo within the meaning of the Securities Act, 15 U.S.C. § 77o, and the Exchange Act, 15 U.S.C. § 78t(a).

The Embryo offering prospectus declared that the company would issue 1,000,000 shares of common stock at $5.00 per share. The prospectus also registered 3,030,000 shares of common stock that had been issued to Selling Securityholders prior to November 17, 1995, and were not part of the IPO. Krasnoff was a Selling Securityholder of Embryo stock.

The prospectus states that the Selling Securityholders had agreed to "lock-up" periods, which meant that they would not sell their shares for a 24–month period, except for certain Selling Securityholders who agreed to a 13–month period. The prospectus also states that the shares owned by the Selling Securityholders were "subject to the earlier release by [Sterling Foster]" (Embryo Prospectus, p. 36). The prospectus further provides that Sterling Foster:

> has no agreements or understandings with any of the Selling Securityholders with respect to release of the securities prior to the 13 month or 24 month period, and has no present intention of releasing any or all of such securities prior to such periods. In recent offerings, however, [Sterling Foster] has released Selling Securityholders substantially prior to the expiration of such periods. (Embryo Prospectus, cover page). The

prospectus further states that the "resale of the securities of the Selling Securityholders are subject to Prospectus delivery and other requirements of the Securities Act of 1933" (Embryo Prospectus, cover page). Lulkin signed the registration statement, which included the prospectus, and Embryo, Lulkin, Sterling Foster, and Lieberman disseminated the offering documents.

The subclass contends that the registration statement and prospectus contain misstatements and omissions of material facts because they fail to indicate that Sterling Foster and the Selling Securityholders had already agreed that Sterling Foster would release the Selling Securityholders from their lock-up agreements and would purchase their shares at a substantial discount to the prevailing market price in order to cover a huge short position Sterling Foster intended to establish shortly after trading commenced.

On November 17, 1995, Embryo common stock was approved for listing on the NASDAQ and trading in the stock commenced. Sterling Foster accounted for approximately 93% of the total trading volume on the first day of trading, most of this activity occurred in the first forty minutes of aftermarket trading. At the end of the day, Sterling Foster was a net retail seller of approximately 2,500,000 shares of Embryo stock, which closed at $10.875 per share. This short position represented more than double the company's public float and was valued at over $27,000,000. The next day, Sterling Foster traded fewer than 40,000 shares, and the overall trading volume in Embryo dropped significantly.

The Embryo Subclass maintains that three months later, on February 14, 1996,

Sterling Foster mounted another massive sales effort, selling approximately 1,833,720 shares to its retail customers and establishing another enormous short position, which was valued at approximately $15,000,000. To reach this end, Sterling Foster rewarded its registered representatives with a "$.70 per share sales credit with 100% payout, much more than they would have received for selling any other security at the time" (complaint ¶ 120).

To cover its short positions, Sterling Foster, Lieberman, Pace, Novich, "and others" released the Selling Securityholders from their lock-up agreements and purchased all of the 3,030,000 shelf shares at $2.00 per share, which price was a substantial discount to the prevailing market price for the securities. None of these transactions was reported to the NASDAQ or disclosed to the investing public.

The Embryo Subclass raises five claims against the defendants, many of which are asserted against Lulkin and Embryo. However, in a letter dated January 13, 2000, the parties informed the Court that they have entered into a Memorandum of Understanding settling the action with Lulkin and Embryo. Accordingly, this decision does not refer to Lulkin or Embryo as defendants to any of the particular claims.

In claim three, the Embryo Subclass alleges that Sterling Foster, Lieberman, Pace, Novich, and Krasnoff violated Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o. The Embryo Subclass claims that the company's registration statement and prospectus contained untrue statements of material facts and omitted other facts necessary to make the statements made not misleading.

In claim nine, the Embryo Subclass alleges that Sterling Foster, Lieberman, Pace, Novich, Hawley, and Paulson violated Sections 12(a) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77o.

Claim fifteen alleges that Sterling Foster, Lieberman, Hawley, Paulson, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by manipulating the market for Embryo stock, thereby artificially inflating the price of the stock and defrauding the Embryo Subclass in connection with the purchase of the securities. The subclass also alleges that the defendants made misstatements and omissions of material fact upon which the subclass relied and which caused them to suffer injury. The Embryo Subclass further maintains that its members were unaware of the market manipulation when they purchased the Embryo stock, and had they been aware of the scheme, they would not have purchased Embryo at the artificially inflated price.

Claim twenty-one alleges that Sterling Foster, Lieberman, Hawley, and Paulson made negligent misrepresentations to the Embryo Subclass by failing to fulfill their obligation of disclosing material facts. In claim twenty-seven, the Embryo Subclass alleges that Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Section 349 of the N.Y. Gen. Bus. L.

### d. The Allegations of the Applewoods Subclass

The Applewoods Subclass consists of individuals who purchased Applewoods securities during the period commencing on April 10, 1996, the date on which the Applewoods registration statement became effective, and terminating on October 8, 1996, the date on which the *Bloomberg Newswire* reported that the NASD had charged Sterling Foster with securities fraud. The lead plaintiffs of the Applewoods Subclass are Wright and Reynoso,

who purchased Applewoods securities as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Wright | 1500 | 4/12/96 | 14 |
| | 1500 | 4/12/96 | 14 |
| | 3000 | 4/19/96 | 16¼ |
| Reynoso | 1000 | 4/11/96 | 13¾ |
| | 600 | 4/22/96 | 16⅞ |
| | 400 | 4/23/96 | 16⅞ |

The additional plaintiffs include Noam and Stephanie Sharf (the "Sharfs"), who purchased shares of Applewoods Securities as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Sharfs | 1000 | 4/11/96 | 13½ |
| | 400 | 4/22/96 | 25⅞₀ |
| | 400 | 4/23/96 | 16⅝ |

The Applewoods Subclass contends that their shares of Applewoods are traceable to the Applewoods statement and prospectus.

Applewoods created, manufactured, and marketed natural beauty products. Defendant Roger Buoy ("Buoy") was the CEO; defendant Terence McAuley ("McAuley") was a CFO and Secretary; defendant Tony Swash ("Swash") was the Chief Operating Officer ("COO") and a Director; defendant Carmen Villalon ("Villalon") was a Director; and defendant Armando Araujo ("Araujo") was a Director (collectively, the "Individual Applewoods Defendants" or the "IADs"). The plaintiffs allege that the IADs were "controlling persons" of Applewoods within the meaning of the Securities Act, 15 U.S.C. § 77o, and the Exchange Act, 15 U.S.C. § 78t(a).

The Applewoods prospectus and registration statement declare that the company would issue 1,200,000 shares at the offering price of $5.00 per share. The prospectus also registered 480,000 shares of common stock that had been issued to Selling Securityholders. The prospectus states that "[t]he securities held by the Selling Securityholders may be resold at any time following the date of this Prospectus," but such resale would be "subject to Prospectus delivery and other requirements of the Securities Act of 1933" (Applewoods Prospectus, p. 44). According to the prospectus, the shelf shares could be sold by the Selling Securityholders or by Sterling Foster. However, if Sterling Foster were to sell them, it must receive NASD approval prior to any sale. The IADs signed the registration statement, and Sterling Foster, Lieberman, Pace, and Novich were responsible for disseminating the registration statement and prospectus.

The Applewoods Subclass contends that the registration statement and prospectus contain misstatements and omissions of material fact because they do not indicate that Sterling Foster and the Selling Securityholders, one of whom was Krasnoff, had already agreed that Sterling Foster would sell the Selling Securityholders' shares on the open market shortly after the Applewoods IPO at prices far greater than the Selling Securityholders had paid for their shares.

The Applewoods Subclass alleges that from April 10, 1996 through October 31, 1996, "the defendants engaged in substantially the same, if not the identical, wrongful conduct in connection with Applewoods as that described above concerning Advanced Voice, Com/Tech, and Embryo." According to the Second Amended Complaint, Sterling Foster, acting through Lieberman, Pace, Novich, "and others" controlled the aftermarket trading in Applewoods in a manner that restricted the supply of securities available for trading, thus enabling the defendants to maintain an artificially inflated price for the securities.

The Applewoods Subclass raises five claims against the defendants. In claim four, the Applewoods Subclass alleges that Applewoods, the IADs, Sterling Foster,

Lieberman, Pace, Novich, and Krasnoff violated Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o. The Applewoods Subclass maintains that the company's registration statement and prospectus contain untrue statements of material facts and omitted other facts necessary to make the statements made not misleading. Claim ten alleges that Applewoods, the IADs, Sterling Foster, Lieberman, Pace, Novich, Hawley, and Paulson violated Sections 12(a)(2) and 20(a) of the Securities Act, 15 U.S.C. § 77l(a)(2), 77o.

In claim sixteen, the Applewoods Subclass alleges that Applewoods, the IADs, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, and Krasnoff violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5 by manipulating the market for Applewoods securities, thereby artificially inflating the price of the stock and defrauding the Applewoods Subclass in the purchase of Applewoods securities. The Applewoods Subclass also alleges that the defendants made false statements of material fact or omitted material facts upon which the subclass relied and which caused them to suffer injury. The Applewoods Subclass maintains that its members were unaware of the market manipulation, misstatements, and omissions of material fact when they purchased the Applewoods stock, and had they been aware of the scheme, they would not have purchased Applewoods at the artificially inflated prices.

Claim twenty-two alleges that Applewoods, the IADs, Sterling Foster, Lieberman, Hawley, and Paulson made negligent misrepresentations to the Applewoods Subclass, and claim twenty-eight alleges that Applewoods, the IADs, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Section 349 of the N.Y. Gen. Bus. L.

### e. The Allegations of the Lasergate Subclass

The Lasergate Subclass consists of individuals who purchased Lasergate Securities during the period commencing on October 17, 1994, the date on which the registration statement became effective, and terminating on October 8, 1996, the date on which the *Bloomberg Newswire* reported that the NASD had charged Sterling Foster with securities fraud. The lead plaintiff of the Lasergate Subclass is Petit, who purchased the securities in the following manner:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Petit | 10,000 | 10/10/95 | 4⅞ |

The additional plaintiffs include Valentine, Stauffer, and Gross, who purchased shares as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
|---|---|---|---|
| Valentine | 2000 | 2/17/95 | 13⅝ |
| | 2000 | 3/9/95 | 7¾ |
| | 1000 | 4/27/95 | 8¾ |
| | 3000 | 6/27/95 | 5⅛ |
| Stauffer | 500 | 11/18/94 | 11¼ |
| Gross | 2500 | 10/11/95 | 6⅝ |
| | 300 | 3/29/96 | 1⅞₆ |

The Lasergate Subclass contends that their shares of Lasergate are traceable to the Lasergate's registration statement and prospectus.

Lasergate sells admissions systems for amusement parks, theme parks, and other public facilities. Lasergate had an IPO of its common stock in July 1987 at $1.00 per share. Active trading ceased in August 1990. In October 1994, Sterling Foster underwrote the secondary offering of Lasergate securities. The prospectus de-

clares that the company would issue 800,-000 units (one common share and two warrants to purchase common stock) at a price of $5.50 per unit. The prospectus also registered 1,734,895 shares of common stock belonging to Selling Shareholders "for concurrent or future sales by the Selling Shareholders" (Lasergate Prospectus, p. 40), but states that these shares were subject to lock-up agreements. In particular, the prospectus states, "All of the Selling Shareholders will agree not to offer, sell or otherwise dispose of the Selling Shareholders' Shares for a period of 18 months after the date of this Prospectus without the prior written consent of the Underwriter" (Lasergate Prospectus, p. 40). Lasergate, Sterling Foster, and Lieberman were responsible for disseminating the registration statement and prospectus.

The Lasergate Subclass contends that the prospectus and registration statement contained false statements and material omissions because it failed to disclose that Sterling Foster and the Lasergate Selling Securityholders had already agreed that Sterling Foster would release the Selling Securityholders from their lock-up agreements and would purchase their shares at a substantial discount to the prevailing market price in order to cover a huge short position Sterling Foster intended to establish shortly after trading commenced.

On October 17, 1994, the Lasergate registration statement became effective and trading in the stock began the next day. The Lasergate Subclass contends that from October 17, 1994 through October 31, 1996, the defendants engaged in the same wrongful conduct in connection with Lasergate as it did in connection with Advanced Voice, Com/Tech, Embryo, and Applewoods. The subclass specifically alleges that Sterling Foster, acting through Lieberman, Pace, Novich, "and others" controlled the market for Lasergate securities so that the supply of Lasergate securities available for trading was significantly restricted, thus artificially inflating the price of the security in the aftermarket.

The Lasergate Subclass raises five claims against the defendants. Claim five alleges that Lasergate, Sterling Foster, Lieberman, Pace, and Novich violated Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, because the registration statement and prospectus contained false statements of material fact and omissions of fact that were necessary to make other statements made not misleading.

In claim eleven, the Lasergate Subclass alleges that Lasergate, Sterling Foster, Lieberman, Pace, Novich, Hawley, and Paulson violated Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77o.

Claim seventeen alleges that Lasergate, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, and Harriton violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5 by manipulating the market for Lasergate stock, thereby artificially inflating the price of the stock and defrauding the Lasergate Subclass in connection with their purchase of the securities. The subclass also alleges that the defendants made false statements and omissions of material fact upon which the subclass relied and which caused them to suffer injury. The Lasergate Subclass maintains that its members were unaware of the market manipulation when they purchased the Lasergate stock, and had they been aware of the scheme, the would not have purchased the Lasergate at artificially inflated prices.

Claim twenty-three alleges that Lasergate, Sterling Foster, Lieberman, Hawley, and Paulson made negligent misrepresen-

tations to the Lasergate Subclass, and claim twenty-nine the Lasergate Subclass alleges that Lasergate, Sterling Foster, Lieberman, Pace, Novich, Bear Stearns, BSSC, Harriton, Hawley, Paulson, and Krasnoff violated Section 349 of the N.Y. Gen. Bus. L.

### f. The Allegations of the ML Direct Subclass

The ML Direct Subclass consists of individuals who purchased ML Direct Securities during the period commencing on September 3, 1996, the date on which the registration statement became effective, and terminating October 8, 1996, the date on which the *Bloomberg Newswire* reported that the NASD had charged Sterling Foster with securities fraud. The lead plaintiffs are Wright, Reynoso, and Petit, who purchased shares of ML Direct as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
| --- | --- | --- | --- |
| Wright | 3000 | 9/9/96 | 14 |
| Reynoso | 1000 | 9/4/96 | 14¼ |
| Petit | 3400 | 9/4/96 | 13⅞ |

The additional plaintiffs include Maxey who purchase shares of ML Direct as follows:

| Plaintiff | Number of Securities | Date of Purchase | Price |
| --- | --- | --- | --- |
| Maxey | 3500 | 9/4/96 | 14½ |

The ML Direct Subclass contends that their shares of ML Direct are traceable to the company's registration statement and prospectus.

Defendants Pace and Novich organized ML Direct to sell consumer products through a home shopping network. During the Subclass period, Shalek was Chairperson of the Board, and prior to the offering, she owned or controlled 17.1% of the company. The plaintiffs allege that she was a "controlling person" of ML Direct within the meaning of the Securities Act, 15 U.S.C. § 77*o*, and the Exchange Act, 15 U.S.C. § 78t(a). Lulkin was a principal stockholder of ML Direct, and his company, Special Equities, Inc. ("Special Equities"), owned 1,080,000 shares of ML Direct, 34.6% of the company, prior to the IPO.

The ML Direct offering was underwritten by Patterson Travis, not by Sterling Foster. The offering prospectus declares that ML Direct would issue 480,000 units (two shares of common stock and one common stock purchase warrant at $15 per unit). The prospectus also registered 2,400,000 shares of common stock, 2,000,000 Class A warrants, and 2,000,000 shares of common stock underlying the Class A warrants, all of which had been issued to Selling Securityholders prior to September 3, 1996, and none of which was part of the ML Direct IPO. The prospectus states that the Selling Securityholders had agreed, in writing, not to sell their securities until 12 months after the effective date of the prospectus without written consent of the underwriter. The prospectus also provides that Patterson Travis retained the sole discretion to release the Selling Securityholders from their lock-up agreements. If the Selling Securityholders' shares were sold to the investing public, such resale would be "subject to Prospectus delivery and other requirements of the [Securities] Act" (ML Direct Prospectus, pp. 2, 32). Shalek signed the registration statement, which included the prospectus.

The ML Direct Subclass contends that the registration statement and prospectus contained material misstatements and omissions because they failed to disclose that the Selling Securityholders would be released from the lock-up agreements and had already agreed to sell their shares to Sterling Foster at substantially discounted prices and shortly after trading had begun.

On September 3, 1996, the ML Direct registration statement became effective,

and trading in the company's stock began the following day. The ML Direct Subclass alleges that from September 3, 1996 through October 31, 1996, the defendants engaged in the same wrongful conduct with regard to ML Direct as they did in connection with Advanced Voice, Com/Tech, Embryo, and Applewoods. Sterling Foster, acting through Lieberman, Pace, and Novich, controlled the market in ML Direct so that the number of securities available for trading was restricted, thus enabling Sterling Foster to artificially inflate the price of the securities.

The ML Direct Subclass raises five claims against the defendants. In claim six, the subclass alleges that ML Direct, Shalek, and Krasnoff violated Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o, because the registration statement and prospectus contained untrue statements of material facts, and omitted to state other facts that were necessary to make the statements contained in the prospectus not misleading.

Claim twelve alleges that ML Direct and Shalek violated Sections 12(a)(2) and of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77o.

In claim eighteen, the subclass alleges that ML Direct, Shalek, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78k(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by manipulating the market for ML Direct securities thereby artificially inflating the price of the stock and defrauding the subclass in connection with the purchase of their securities. The ML Direct Subclass also alleges that the defendants made false statements or material omissions upon which the subclass relied and which caused them to suffer injury. The Second Amended Complaint asserts that the defendants engaged in a scheme to artificially inflate the price of ML Direct stock through the dissemination of false information; Sterling Foster's short sales of the stock; and creating the appearance of actual trading through market manipulation. The ML Direct subclass contends that its members were unaware of the scheme to manipulate the market when they purchased their shares of ML Direct, and had they known of the scheme, they would not have purchased shares of ML Direct at the artificially inflated prices.

Claim twenty-four alleges that ML Direct, Shalek, Sterling Foster, Lieberman, Hawley, and Paulson made negligent misrepresentations to the ML Direct Subclass by failing to fulfill their obligation of disclosing material facts. Claim thirty alleges that ML Direct, Shalek, Sterling Foster, Lieberman, Hawley, Paulson, Pace, Novich, Bear Stearns, BSSC, Harriton, and Krasnoff violated Section 349 of the N.Y. Gen. Bus. L.

### 3. Claim Thirty–One

The thirty-first claim is brought by all putative class members against Sterling Foster, Lieberman, Pace, Novich, Lulkin, Bear Stearns, BSSC, and Harriton for common law fraud. The plaintiffs allege that the defendants used a scheme to defraud to induce the plaintiffs to purchase the Issuer Defendants' securities. The plaintiffs assert that when they purchased the defendant companies' securities at artificially inflated prices, they were ignorant of the nature of the defendants' conduct and relied upon the integrity of the market. The plaintiffs state that had they been aware of the true facts, they would not have purchased the defendant companies' securities at artificially inflated prices.

## II. *DISCUSSION*

As noted, this decision addresses the fourteen motions pending in the present consolidated class action, *Rogers*, 97 CV

189. The nine motions to dismiss the complaint were filed by the following defendants: (1) Sterling Foster, Lieberman, Hawley, and Paulson (the "Sterling Foster Defendants"); (2) Com/Tech, ML Direct, and Shalek (the "Shalek Defendants"); (3) Pace; (4) Novich, (5) Lasergate; (6) the Bear Stearns Defendants; (7) Harriton; (8) Applewoods, and (9) the IADs. Four defendants have filed motions to stay the action: Pace, Novich, Shalek and Krasnoff. In addition, the plaintiffs have filed a motion to lift the automatic stay of discovery.

## A. The Motions to Dismiss the Second Amended Complaint

■ On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. *See King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (holding that dismissal is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *See Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. *See Villager Pond,* 56 F.3d at 378. The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 127 (2d Cir.1999); *Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998).

■ In making this determination, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999); *see Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000) (holding that for the purpose of deciding a motion to dismiss, the complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999). The Court also may consider documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *Rothman,* 220 F.3d at 97; *Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991). Further, in securities fraud actions, the court may consider "public disclosure documents required by law to be and which actually have been filed with the SEC." *Rothman,* 220 F.3d at 89 (citing *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996).

### 1. Standing

The Sterling Foster Defendants, the Shalek Defendants, Lasergate, Pace and Novich move to dismiss the Section 11 and 12(a)(2) claims on the ground that the lead plaintiffs lack the standing to bring those claims because they did not purchase their securities in the actual public offering but, rather, in secondary market transactions. Applewoods and the IADs adopt and incorporate this argument in their motions to dismiss the complaint.

Section 12(a)(2) of the Securities Act grants buyers an express cause of action for rescission against sellers who make material misstatements or omissions "by means of a prospectus." 15 U.S.C. § 77*l*(a)(2). In *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), the Supreme Court was presented with the question of whether "this right of rescission extends to a private secondary transaction, on the theory that recitations in the purchase agreement are part of a 'prospectus.'" *Id.* at 564, 115 S.Ct. at 1064. *Gustafson* did not involve a public offering or the issue of whether aftermarket purchasers have standing to sue under Section 12(a)(2). Rather, *Gustafson* involved the purchase of a company pursuant to a purchase agreement and contract of sale. *Id.* at 564–66, 115 S.Ct. at 1065–66. When the company's earnings were lower than the estimates relied upon in negotiating the purchase price, the buyers filed suit seeking rescission of the contract pursuant to Section 12(a)(2) on the ground that the contract of sale was a "prospectus". *Id.* at 565, 115 S.Ct. at 1065.

The Court held that the "word 'prospectus' is a term if art referring to a document that describes a public offering of securities by an issuer or controlling shareholder.'" *Id.* at 584, 115 S.Ct. at 1073–74. The Court concluded that the private sales contract did not fall within this definition and, therefore, was not a prospectus for the purposes of Section 12(a)(2). *Id.* The Court also indicated, in *dicta*, that a Section 12(a)(2) suit may only be maintained by a person who purchased the stock in the offering under the prospectus. In particular, the Court stated, "The intent of Congress and the design of the statute require that § 12(a)(2) liability be limited to public offerings." *Id.* at 578, 115 S.Ct. at 1071. The Court also stated that "the liability imposed by § 12(a)(2) cannot attach unless there is an obligation to distribute the prospectus in the first place." *Id.* at 571, 115 S.Ct. at 1067.

Courts in this Circuit have applied the rationale of this *dicta* to reach what is now the predominate conclusion that purchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2). *See Laser Mortgage Management, Inc. v. Asset Securitization Corp.*, No. 00 Civ. 8100, 2001 WL 1029407 (S.D.N.Y. Sept.6, 2001) (noting that the predominate view is that Section 12(a)(2) applies only to public offerings); *Dafofin Holdings, S.A. v. Hotelworks.com, Inc.*, No. 00 Civ. 7861, 2001 WL 940632 *6 (S.D.N.Y. Aug.17, 2001) (concluding that courts in this circuit have consistently interpreted *Gustafson* to exclude purchasers in private or secondary market offerings from bringing actions under Section 12(a)(2)); *Waltree Ltd. v. Ing Furman Selz, LLC,* 97 F.Supp.2d 464, 469 (S.D.N.Y. 2000) ("Despite its seemingly broad language, § 12(a)(2) encompasses a narrow category of transactions—public offerings of securities via a written prospectus."); *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 693–94 (S.D.N.Y.2000) ("Purchasers in private or secondary market offerings do not have standing to bring actions under Section 12(2)."); *Milman v. Box Hill Sys., Corp.,* 72 F.Supp.2d 220, 228 (S.D.N.Y.1999) ("[Section] 12 does not provide a general cause of action for all material misstatements made by a publicly owned and traded company, [but r]ather ... establishes a specific basis of liability for statements made in connection with the offering and sale of a security."); *Hudson Venture Partners, L.P. v. Patriot Aviation Group, Inc.,* No. 98 Civ. 4132, 1999 WL 76803 (S.D.N.Y. Feb.17, 1999) (holding that the plaintiff correctly pointed out that the court had previously held that Section 12(a)(2) applies only to misrepresentations made in connection with a public offering); *Saslaw v. Askari,* No. 95 Civ. 7641 (LAP),

1997 WL 221208 (S.D.N.Y. April 25, 1997) (stating that although academic analysis of *Gustafson* is "uniformly critical," its holding that purchasers in the secondary market lack standing to bring a § 12(a)(2) action is binding); *Glamorgan Coal Corp. v. Ratner's Group, PLC,* No. 93 Civ. 7581 (RO), 1995 WL 406167 (S.D.N.Y. July 10, 1995) ("Every court since *Gustafson,* including this district, has held in light of *Gustafson,* that § 12(a)(2) applies only to initial public offerings."); *see also Joseph v. Q.T. Wiles,* 223 F.3d 1155, 1160 (10th Cir.2000) ("The Court [in *Gustafson* ] held that a private contract is not an offering document ... and indicated in *dicta* that only purchasers in the initial public offering could bring suit pursuant to section 12(2).") ; *Maldonado v. Dominguez,* 137 F.3d 1, 7 (1st Cir.1998) ("[T]he Supreme Court conclusively decided that section 12(a)(2) applies exclusively to 'initial public offerings.'"). *But see Feiner v. SS&C Technologies, Inc.,* 47 F.Supp.2d 250, 252 (D.Conn.1999) (holding that Section 12(a)(2) does not distinguish between purchasers in the initial distribution and purchasers in the aftermarket, and thus, aftermarket buyers have standing to sue under 12(a)(2)).

The plaintiffs have not presented the Court with a persuasive reason to depart from the holdings of these cases. In a conclusory argument that spans just over one page, the plaintiffs simply claim that *Gustafson* does not restrict aftermarket purchasers from suing under Section 12(a)(2). They support this bald assertion by referring to three cases, all of which support the contrary or unrelated propositions. *See Milman,* 72 F.Supp.2d 220, *In re Fine Host Corp. Sec. Litig.,* 25 F.Supp.2d 61 (D.Conn.1998); *In re AES Corp. Sec. Litig.,* 849 F.Supp. 907 (S.D.N.Y.1994). As noted above, in *Milman,* 72 F.Supp.2d at 228, the Court held that Section 12(a)(2) establishes a specific basis of liability for statements made in connection with the offering and sale of a security not a general cause of action for material misstatements made by a publicly owned company. The second case cited by the plaintiffs, *In re Fine,* 25 F.Supp.2d 61, pertains to actions brought pursuant to Section 11, and the third case, *In re AES Corp.,* 849 F.Supp. 907, was decided prior to the Supreme Court's decision in *Gustafson.*

■ In light of the fact that the plaintiffs have not put forth a compelling reason to depart from the numerous decisions by the courts in this circuit, this Court adopts this position and finds that plaintiffs have standing to sue under Section 12(a)(2) only if they claim to have purchased their securities in the various public offerings rather than in the secondary markets. The members of each subclass allege that they purchased their securities "pursuant to and traceable to" the respective prospectus (complaint ¶¶ 253, 263, 273, 283, 293, 302). However, none of the plaintiffs asserts that the securities were purchased during the offering.

Some of the purchase dates listed in the complaint are close enough in time to suggest that the plaintiffs could have made their purchases in the offering. The Advanced Voice registration statement became effective on February 6, 1995, and the Moreheads purchased Advanced Voice securities on February 7, 1995. The Com/Tech registration statement became effective on August 23, 1995; Kent and Stauffer purchased shares of the company on the same day; Petit, Valentine, and Gross bought their shares on August 24, 1995; and Stauffer purchased additional shares on August 28, 1995. The Embryo registration statement became effective on November 17, 1995; and Rogers, Petit, Lepera, Maxey, and Smith purchased securities on the same day. The Applewoods registration state-

ment became effective on April 10, 1996; Reynoso and the Sharfs purchased shares of the company on April 11, 1996; and Wright purchased shares on April 12, 1996. The ML Direct registration statement became effective on September 3, 1996; on September 4, 1996, Reynoso, Petit, and Maxey purchased shares in the company; and on September 9, 1996, Wright bought shares of ML Direct.

Nevertheless, in the Court's view, the plaintiffs should specify at the pleading stage whether they made these purchases in the offering or in the secondary market. Accordingly, because the plaintiffs fail to allege that they purchased the securities in a public offering, as opposed to in the aftermarket, their Section 12(a)(2) claims are dismissed.

The Sterling Foster Defendants, the Shalek Defendants, and Lasergate further argue that the Supreme Court's holding in *Gustafson* also limits Section 11 standing to purchasers in an initial public offering. Section 11(a) provides in relevant part as follows:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact ... necessary to make the statements therein not misleading, any person acquiring such security ... may ... sue.

15 U.S.C. § 77k(a). It has long been the law in this Circuit that a person who can trace his securities to a registered offering has standing to sue under Section 11. *See Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir.1967). However, following the Supreme Court's decision in *Gustafson*, 513 U.S. 561, 115 S.Ct. 1061, the court in *In re WRT Energy Sec. Litig.*, Nos. 96 Civ. 3610(JFK), 96 Civ. 3611(JFK), 1997 WL 576023 (S.D.N.Y. Sept.15, 1997), held that *Gustafson* limits Section 11 standing to

plaintiffs who purchased their shares in an initial offering.

Notwithstanding the decision in *In re WRT Energy*, 1997 WL 576023, the majority of courts in this Circuit that have been presented with this issue have followed the reasoning and conclusion of Judge Sweet in *Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 126 (S.D.N.Y.1998). There, Judge Sweet pointed out that *Gustafson* did not involve a Section 11 claim or a public offering and, therefore, did not limit Section 11 standing to initial purchasers. *See Adair*, 179 F.R.D. at 131–32.

Judge Sweet also wrote that the plain language of the statute supports the conclusion that Section 11 standing is open to purchases in the secondary market. *Id.* at 132. First, he emphasized that the statute applies to "any person" who acquired a security. *Id.* In addition, he determined that Congress clearly "contemplated that a plaintiff could purchase a registered security well after the IPO and still have a remedy under § 11," *id.*, because the statute requires that reliance be established "if a person acquired the security after the issuer has made generally available to its security holders an earnings statement." *Id.* (quoting 15 U.S.C. § 77k(a)). Judge Sweet also noted that if Congress intended to limit plaintiffs to those who purchased securities in an IPO, it would not have drafted Section 11(e), which "permits recovery for purchases at other than the offering price." *Id.*

Judge Sweet determined that the legislative history was "ambiguous about whether purchasers in the aftermarket who can trace their securities back to the defective registration statement have standing." *Id.* Indeed, the House Report states, " '[T]he [Securities Act] affects only new offerings of securities.... It does not affect the ordinary redistribution of securities unless such redistribution takes on the

characteristics of a new offering.'" *Id.* at 132 (quoting House Report at 5). However, the House Report simultaneously states that Section 11 remedies are available "'regardless of whether [plaintiffs] bought their securities at the time of the original offer or at some later date.'" *Id.* (quoting House Report at 5). Thus, after distinguishing *Gustafson,* analyzing the plain language of the statute, and reviewing its legislative history, Judge Sweet concluded that "[t]o limit [Section 11] liability only to buyers in the IPO and not to buyers who can trace their shares to the registration statement allows the issuers to escape a margin of liability for which [Section] 11 was drafted to cover." *Id.* at 133.

■ This Court is persuaded by Judge Sweet's well reasoned decision and joins the other courts in this Circuit in holding that the limitation on standing created by *Gustafson* does not extend to Section 11 claims. *See Dorchester Investors v. Peak Trends Trust,* No. 99 Civ. 4696, 2002 WL 272404 (S.D.N.Y. Feb.26, 2002) ("Thus, the Court here, following the guidance of other district courts in this Circuit and the language of the statute, concludes that secondary market purchasers who fall within the class may pursue a Section 11 claim against the defendants."); *In re Complete Mgmt., Inc. Sec. Litig.,* 153 F.Supp.2d 314, 338–39 (S.D.N.Y.2001) (concluding that Section 11 remains unchanged by *Gustafson* ); *Milman v. Box Hill Sys. Corp.,* 192 F.R.D. 105, 107–09 (S.D.N.Y.2000); *In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 694 (S.D.N.Y.2000) (holding that contrary to Section 12(2)'s standing requirements, standing under Section 11 is not limited to initial purchasers and, therefore, plaintiffs making aftermarket purchases who can trace their securities to the offering have standing under Section 11); *Salomon Smith Barney v. Asset Securitization Corp.,* No. 98 Civ. 4186(BSJ), 1999 WL 1095605 (S.D.N.Y.1999) (finding that *Gus-*

*tafson* is wholly distinguished from Section 11 cases and that aftermarket purchasers have standing to bring Section 11 claims in light of the precedent in this Circuit and Judge Sweet's reasoning in *Adair* ); *see also Joseph v. Q.T. Wiles,* 223 F.3d 1155, 1160–61 (10th Cir.2000) (concluding that *Gustafson* does not limit the standing of those who may bring a claim under Section 11 to purchasers in the initial public offering); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1079–82 (9th Cir.1999) (holding that "any person" who purchases a security issued under the registration statement for that security has standing to bring a Section 11 claim regardless of when he purchased the security).

Thus, in light of the Second Circuit's holding in *Barnes v. Osofsky,* 373 F.2d 269, 273 (2d Cir.1967), and for the reasons stated in *Adair,* the Court finds that secondary market purchasers who can trace their shares to a registered offering have standing to sue under Section 11. Here, the subclasses have pled that they purchased their respective securities "pursuant to, or traceable to," the registration statement for the security (complaint ¶¶ 181, 194, 208, 221, 232, 243). Accordingly, the Court finds that all the putative subclasses have standing to sue under Section 11, and the defendants' motions to dismiss the Section 11 grounds on this basis are denied.

Lasergate argues that even if a tracing theory is still viable after *Gustafson,* the plaintiffs purchases of Lasergate cannot be "traced" to the Lasergate offering at issue here. The plaintiffs point out that the Lasergate's offering was a secondary offering, and therefore, the shares purchased by the plaintiffs could have been from the secondary offering or the open market. The Court finds that Lasergate's argument goes to the merits of the Lasergate Subclass' Section 11 claim rather than to whether the Lasergate Subclass has

standing to bring the claim in the first instance. Although the Court is not persuaded by Lasergate's argument at this point in the litigation, the company may choose to renew the argument at a future point when a factual determination by the Court would be appropriate.

In sum, the Court grants the defendants' motions to dismiss the Section 12(a)(2) claims, and claims seven through twelve are dismissed on the ground that the plaintiffs lack the standing to raise them. The Court denies the defendants' motion to dismiss the Section 11 claims because the plaintiffs have such standing.

## 2. The Statute of Limitations

Claims under Section 11 and Section 10(b) must be brought both within one year of the discovery of the facts underlying the alleged violation, and within three years of the alleged violation. *See* 15 U.S.C. §§ 77m, 78i(e); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). For the purposes of this statute of limitations, discovery of facts "includes constructive or inquiry notice, as well as actual notice." *Menowitz v. Brown*, 991 F.2d 36, 41–42 (2d Cir.1993); *see Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000); *Dodds v. Cigna Securities Inc.*, 12 F.3d 346, 350 (2d Cir.1993).

■ Thus, "[a] plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds*, 12 F.3d at 350. A potential plaintiff is deemed to have received inquiry notice "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds*, 12 F.3d at 350. The information giving rise to inquiry notice includes "any financial, legal or other data available to the plaintiffs providing them with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]." *In re Integrated Resources Real Estate Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993). When the potential plaintiff receives these "storm warnings," a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds*, 12 F.3d at 350.

■ After "storm warnings" appear, plaintiffs must exhibit reasonable diligence investigating the probability that they have been defrauded. *Rothman*, 220 F.3d at 97; *Dodds* 12 F.3d at 350; *De La Fuente v. DCI Telecommunications, Inc.*, 206 F.R.D. 369 (S.D.N.Y.2002). A plaintiff who is on inquiry notice and who fails to exercise reasonable care and diligence in seeking to uncover the facts underlying the fraud "will be charged with notice of such facts as a diligent inquiry would have disclosed." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F.Supp.2d 444, 457 (S.D.N.Y.2001); *Rothman*, 220 F.3d at 96; *Dodds*, 12 F.3d at 350.

■ It is important to note that the date of "discovery" that commences the statute of limitations in a case where the plaintiff has received "inquiry notice" is not the date that the duty of inquiry arises. *See Rothman*, 220 F.3d at 97. Rather, the date of discovery is the date that the plaintiff, having obtained inquiry notice, "in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman*, 220 F.3d at 97. In *Rothman*, 220 F.3d 81, the Second Circuit was careful to distinguish the date a plaintiff receives inquiry notice from the date on which the statute of limitations commences. There, the Court reiterated its holding in *Dodds*, 12

F.3d at 350, stating, "'A plaintiff in a federal securities case will be deemed to have discovered fraud for the purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence *would have discovered* the existence of the fraud.'" *Rothman,* 220 F.3d at 97 (quoting *Dodds,* 12 F.3d at 350) (emphasis in the original). The Court of Appeals also reviewed a Tenth Circuit opinion in which that Court held that inquiry notice "triggers an investor's duty to exercise reasonable diligence," but the limitations period does not begin to run until "the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the fraud." *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1201 (10th Cir.1998). The Second Circuit concluded that in accordance with its own precedent and with *Sterlin,* whether a federal securities claim is time-barred turns on "*when,* after obtaining inquiry notice . . . the [plaintiffs] in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman,* 220 F.3d at 97.

### a. The Sterling Foster Defendants and the Shalek Defendants

The Sterling Foster Defendants and the Shalek Defendants claim that the plaintiffs received inquiry notice on the dates the various prospectuses became effective because those offering documents contain explanations of the risks associated with the plaintiffs' investments that triggered the duty to inquire. These defendants argue that because the original complaints were filed more than one year after the dates of the prospectuses, the plaintiffs' federal securities claims against them are time-barred. On the other hand, the plaintiffs assert that they could not reasonably have discovered the true nature of the fraudulent scheme from the information contained in the offering documents. They claim that they were not on inquiry notice of the probability of fraud until the publi-

cation of the *Bloomberg Newswire* story on October 8.1996, which they state provided notice that Sterling Foster, Advanced Voice, Com/Tech, and Embryo had engaged in a scheme to defraud investors. The plaintiffs maintain that all five of the original complaints were timely as they were filed within one year of that date.

■ The Court has reviewed all the prospectuses and finds that their content does not suggest to an investor of ordinary intelligence the probability that he has been defrauded. *Dodds,* 12 F.3d at 350. Undoubtedly, the prospectuses advise potential investors that an investment in the securities described involves risk that stems from, among other things, recent operating losses, insufficient working capital, dependence on offering proceeds, possible conflicts of interest, competition, possible volatility of the stock price, rapidly changing technology, dependence on suppliers, potential intellectual property infringements, the arbitrary determination of an offering price, and an inexperienced underwriter. In addition, the prospectuses advise potential investors that Sterling Foster could release the Selling Securityholders from their lock-up agreements at any point.

These statements clearly warn potential investors of the risks associated with investing in these IPOs. Indeed, that is the purpose of the "Risk Factor" section in a prospectus. However, a reasonable investor of ordinary intelligence who read such a prospectus would realize not the probability of fraud but the fact that he must be able to tolerate financial risk to invest in the securities described. Indeed, these statements alone would not lead the reasonable investor to infer a probability "that there were either misleading statements or significant omissions involved in the sale of the [securities]." *In re Integrated Resources Real Estate Litig.,* 815

F.Supp. 620, 638 (S.D.N.Y.1993). As such, the Court finds that the prospectuses themselves do not constitute storm warnings that would trigger a plaintiff's duty to inquire. To hold otherwise would mean that every statement describing the risks associated with an investment would place potential investors on notice of the probability that they will be defrauded.

The Sterling Foster and Shalek Defendants rely on *Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir.1993), for their argument to the contrary. Although the legal standards enunciated in *Dodds* form the basis of this Court's statute of limitations rulings, the Second Circuit's application of those legal standards to the facts in *Dodds* is inapposite. There, the Court of Appeals found that the prospectuses triggered inquiry notice because they clearly disclosed the matters that were the subject of the plaintiff's lawsuit. *Dodds*, 12 F.3d at 351. In particular, the prospectuses advised a reasonable investor of the commissions, the risk and the illiquidity of the investments, and the plaintiff claimed that the defendants made material false statements and omissions inducing her to invest in securities that were unsuitable for her because they were too risky or illiquid. *Dodds*, 12 F.3d at 349.

Here, on the other hand, the prospectuses did not clearly disclose the matters about which the plaintiffs complain. The registration statements in the present case advised potential investors of, among other things, the companies' shortcomings, the possible volatility of the securities, the arbitrariness of the pricings, and the fact that Sterling Foster could release the Selling Securityholders from their lock-up agreements at any time. However, the plaintiffs allege that the registration statements were fraudulent because they failed to disclose that the Sterling Foster had already agreed to release the Selling Securityholders from the lock-up agreements

and purchase their stock at prices far below the prevailing market price so that Sterling Foster could cover a huge short position it intended to establish in order to manipulate the market price of the various securities. In this case, unlike *Dodds*, the plaintiffs' allegations and the information contained in the prospectuses are wholly disparate, and the former could not possibly have been divined from the latter. Accordingly, the specific factual scenario in *Dodds* is distinguished from this case.

Thus, the Court finds that the prospectuses did not serve as storm warnings that placed the plaintiffs on inquiry notice. As such, the claims against the Sterling Foster and Shalek Defendants are not barred by the statute of limitations, and their motions to dismiss the complaint on that ground are denied.

### b. Bear Stearns and BSSC

██ Unlike the Sterling Foster and Shalek Defendants who, together with additional individuals and entities, were named as defendants in the suits filed in 1997, the Bear Stearns Defendants were not named as defendants until the plaintiffs filed the Second Amended Complaint on February 17, 1999. The Bear Stearns Defendants move to dismiss the claims against them on the ground that they are barred by the statute of limitations. These defendants assert that the plaintiffs had actual knowledge that they had been defrauded when they filed their original complaints in 1997. Therefore, argue the Bear Stearns Defendants, the plaintiffs were on inquiry notice of their alleged involvement in the purported scheme in 1997. The Bear Stearns Defendants further contend that the plaintiffs' failure to exercise any diligence following this inquiry notice now bars their claims.

In response to this argument, the plaintiffs state only that the assertions are

"without merit. There is nothing to suggest that plaintiffs were aware, or upon reasonable inquiry, could have become aware of the Bear Stearns Defendants' participation in the fraudulent conduct."

It appears from the Second Amended Complaint and the plaintiffs' memorandum in opposition to the motions to dismiss filed by the Sterling Foster Defendants, the Shalek Defendants, Pace, and Lasergate, that the plaintiffs treat two news articles, published on October 8 and October 9, 1996, as the storm warnings that triggered their duty to exercise reasonable diligence to investigate the probability that they had been defrauded. The complaint states that "[o]n October 8, 1996, in a story first carried on the *Bloomberg* newswire, it was publicly disclosed that the NASD had filed a complaint against Sterling Foster, charging the firm with making millions of dollars in illegal profits in connection with, among other things, the Advanced Voice IPO" (complaint ¶ 160). The complaint also states that on October 9, 1996, *The Wall Street Journal* "published an article concerning the illicit trading and other wrongful conduct involving Sterling Foster and the Issuer Defendants" (complaint ¶ 161).

The Second Amended Complaint states that following the publication of *The Wall Street Journal* article, the price per share of Advanced Voice, Com/Tech, Embryo, and ML Direct dropped. In their memorandum in opposition to the motions to dismiss the complaint that were filed by the Sterling Foster Defendants, the Shalek Defendants, Pace, and Lasergate, the plaintiffs write, "The public did not become aware of the fraud until October 8, 1996, and the complaints were all filed within one year thereafter" (plaintiffs' memorandum, p. 24). In that memorandum, the plaintiffs also state that "the Bloomberg story on October 8, 1996 ... provided notice that Sterling Foster and three of the Issuer Defendants—Advanced Voice, Com/Tech, and Embryo—had engaged in a scheme to defraud" (plaintiffs' memorandum, p. 26). Although not specifically stated by the plaintiffs, it is reasonably inferable from the complaint and the plaintiffs' memorandum that the plaintiffs view the October 8 and 9, 1996 articles as storm warnings.

The Court has found no reason to depart from the plaintiffs' implied position. As a sidelight, the Court notes that it can rely on the news articles mentioned and quoted in the complaint in determining the present motions to dismiss because they are incorporated in the complaint by reference, and the plaintiffs clearly relied on them in bringing the complaint. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991) (holding that the district court may consider documents that are "integral" to the plaintiffs' claims, even if they are not explicitly incorporated by reference). The *Bloomberg Newswire* piece states that the NASD charged Sterling Foster with netting $53 million in illegal profits, specifically, from the IPOs for Advanced Voice, Com/Tech, and Embryo. The article also describes Sterling Foster's ability to artificially inflate the prices of the various securities and the high pressure sales tactics employed by Sterling Foster brokers.

In addition, *The Wall Street Journal* article, begins with the following sentence:

In one of its largest cases in recent years, the regulatory arm of the National Association of Securities Dealers alleged in a disciplinary proceeding that Sterling Foster & Co. and 15 of its officials, supervisors or brokers made $53 million in illicit profits from improper underwritings, manipulative trading and high-pressure "boiler room" sales practices.

Deborah Lohse, *Sterling Foster Charged by NASD For Illicit Trading*, The Wall Street Journal, Oct. 9, 1996. The article states that the NASD complaint centers on alleged manipulations of millions of shares in the Advanced Voice, Com/Tech, and Embryo IPOs. The article specifies that Sterling Foster was alleged by the NASD to have engaged in a huge scheme to defraud its investors and points out that the NASD believed that fraud played a role in all of Sterling Foster's activities from underwriting, to sales, to trading. Thus, the Court is of the view that the information contained in these articles would "alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of the [securities he purchased]." *In re Integrated Resources Real Estate Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993). Accordingly, the Court concludes that the *Bloomberg Newswire* piece and *The Wall Street Journal* article together create circumstances that would suggest to an investor of ordinary intelligence, who had dealings with Sterling Foster, the probability that he has been defrauded. *Dodds*, 12 F.3d at 350. As such, the Court finds the two articles to be "storm warnings" in this case, and that the investor's duty to exercise reasonable diligence in investigating the alleged fraud arose on October 9, 1996. *See Rothman*, 220 F.3d at 97; *Dodds*, 12 F.3d at 350.

■ As discussed above, for a plaintiff on inquiry notice, the statute of limitations commences not when the duty to inquire arises but when, in the exercise of reasonable diligence, the plaintiffs should have discovered the facts underlying the fraud. *See Rothman*, 220 F.3d at 97; *Dodds*, 12 F.3d at 350. Here, the plaintiffs fail to explain, either in the complaint or in their motions papers, the steps they took to investigate the probability that other entities, such as a clearinghouse, had participated in the fraud. They provide only the conclusory assertion that the arguments interposed by the Bear Stearns Defendants are "without merit" and that "[t]here is nothing to suggest that plaintiffs were aware, or upon reasonable inquiry, could have become aware of the Bear Stearns Defendants' participation in the fraudulent conduct" (plaintiffs' memorandum in opposition to the motion by the Bear Stearns Defendants to dismiss the complaint, p. 22). It is well established that conclusory arguments regarding reasonable diligence are insufficient to overcome a defendant's claims that a plaintiff failed to exercise that conduct. *See Giant Group, Ltd. v. Sands*, 142 F.Supp.2d 503, 509 (S.D.N.Y. 2001). As such, the failure by the plaintiffs to show that they exercised any diligence in seeking to uncover the facts underlying the fraud leaves this Court to conclude that the claims against the Bear Stearns Defendants, which were filed more than two years after the plaintiffs received inquiry notice of the fraud, are time-barred. *See Dodds*, 12 F.3d at 350 (holding that knowledge is imputed to the investor who fails to make a reasonably diligent investigation following receipt of inquiry notice).

Moreover, the Court finds that a reasonable investor of ordinary intelligence would have discovered the alleged involvement of the Bear Stearns Defendants in the purported fraud prior to February 17, 1998, which date must be the date of discovery in light of the fact that the complaint was filed on February 17, 1999, and there is a one-year statute of limitations. Accordingly, the plaintiffs' claims against Bear Stearns and BSSC are time-barred for this reason as well.

Although large, full-service brokerage firms perform all of the steps necessary to complete a securities transaction within their own firm, many of the smaller investment banks and brokerage firms "may

lack the capital, technology, personnel, or expertise" to do so. *See* Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 Bus. Law. 841, 841 (1993). Smaller firms in this position enter into "clearing agreements" by which they introduce their customer accounts to clearing firms that perform functions the "introducing firms" cannot or choose not to perform themselves. *Id.* at 842–43. At a minimum, clearing firms compare and settle— or clear—introduced transactions, which means that they "pay[ ] for the securities purchased and deliver[ ] securities sold in the accounts introduced to them pursuant to clearing agreements." *Id.* There are two types of clearing agreements in the securities industry: "fully disclosed" and "omnibus." *Id.* at 843. In fully disclosed clearing agreements, the identity of the customer and clearing firm are identified. *Id.* However, in an omnibus clearing agreement, neither the clearing firm, nor the introducing firm's customers are aware of each others' identities. *Id.*

The papers presently before the Court do not specify whether Sterling Foster and Bear Stearns had a fully disclosed or an omnibus clearing agreement. However, the Court must draw all reasonable inferences in favor of the plaintiff, *see Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999), and therefore presumes, for the purpose of these motions, that Sterling Foster and Bear Stearns had an omnibus agreement. The Court further presumes that Sterling Foster's customers were unaware that their broker had even contracted with a clearing firm to process their transactions. *See* Minnerop, *supra*, at 843 (stating that at times "customers of the introducing firm may not even know that their broker has contracted with a clearing firm to process their transactions").

However, the Court finds that a reasonable investor of ordinary intelligence would have discovered Bear Stearns' identity and alleged involvement in the scheme to defraud well before February 17, 1998. First, after learning that the NASD had charged Sterling Foster with defrauding customers of millions of dollars, a reasonable investor of ordinary intelligence would investigate how Sterling Foster operated. Even minimal research on small investment banks and brokerage houses would reveal that many of these firms use clearing brokers. *See* Minnerop, at 842–43. Thus, in all likelihood, the Sterling Foster customers would have learned that fact early in their investigation. Upon learning that another broker may have been involved in the alleged scheme, the next step in the reasonable investor's research would be an attempt to discover the identity of that broker. In the Court's view, such an investigation would not have been time consuming, and a reasonable investor of ordinary intelligence who commenced a reasonably diligent investigation on October 9, 1996, would have discovered these facts well before February 17, 1998.

■ Support for the Court's conclusion is found in the NASD arbitration commenced by Howard Greenberg, a Sterling Foster customer who is not a party to this MDL against Bear Stearns and BSSC. The Court notes that it may consider the fact of this arbitration in deciding the present motions to dismiss, because it is mentioned in the complaint (complaint ¶ 77(b)). *See Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999). The Court also takes judicial notice of the Statement of Claim as a public record. *See Rothman*, 220 F.3d at 92 (holding that the court may take judicial notice of documents that are public records); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998) ("It is well established that a district Court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)."). The Court

is considering the information contained in the Statement of Claim not for its truth but, rather, to establish the fact of the filing and fact that the allegations contained in the Statement of Claim were made. *See Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991))).

Greenberg's Statement of Claim alleges that he purchased shares of ML Direct on September 4, 1996, September 10, 1996, and October 8, 1996 upon the solicitation of Sterling Foster. The Statement of Claim also alleges that Bear Stearns and BSSC worked with Sterling Foster "in perpetrating a scheme whereby Sterling Foster could sell many more shares than were available to it or that were available on the market" (Greenberg Statement of Claim, ¶ 3). According to the Statement of Claim, Bear Stearns allowed Sterling Foster to continue its short position for a longer period than that allowed by the applicable regulations without providing security. Greenberg set forth these allegations regarding the association among Bear Stearns, BSSC, and Sterling Foster as well as the alleged involvement of Bear Stearns and BSSC in the scheme to defraud when he filed his statement of claim on May 13, 1997. Given that Greenberg made his allegations regarding Bear Stearns and BSSC as early as May 13, 1997, the Court finds that a reasonable investor of ordinary intelligence would have discovered the facts underlying Bear Stearns and BSSC's association with Sterling Foster and alleged involvement in the scheme to defraud much earlier than February 17, 1998. The plaintiffs' failure to do so and the absence of a reason therefor

renders the claims against the Bear Stearns Defendants barred by the one-year statute of limitations. *See* 15 U.S.C. §§ 77m, 78i(e); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). Accordingly, the Court grants the motion by Bear Stearns Defendants to dismiss the federal securities claims against them, and those claims are dismissed.

### c. Randolph Pace

Like the Bear Stearns Defendants, defendant Pace was not named as a defendant until February 17, 1999 and therefore contends that the claims against him are time-barred. He argues that the plaintiffs acquired inquiry notice on the dates they received the prospectuses because the risk factors contained in the prospectuses constitute storm warnings. The Court rejected the identical argument when it was raised by the Sterling Foster and Shalek Defendants (*see supra* Section II(A)(2)(a)). For the reasons set forth above, *see supra* Section II(A)(2)(a), the Court finds that the risk factors described in the prospectuses are not storm warnings that trigger inquiry notice in regard to defendant Pace.

Pace also argues that the plaintiffs' claims against him are time-barred because they do not satisfy the "relation back" requirements of Rule 15(c). The plaintiffs do not address Pace's Rule 15(c) "relation-back" argument. On the other hand, the plaintiffs assert that the statute of limitations should be equitably tolled in regard to Pace, because his involvement in the alleged scheme was fraudulently concealed until his indictment was made public on November 9, 1998. Therefore, according to the plaintiffs, the February 17, 1999 claims made against Pace in the Second Amended Complaint are timely. Notably, the plaintiffs concede that Pace's

liability extends back to acts committed no more than three years prior to that date, on February 17, 1996.

■■■ The plaintiffs offer no relevant caselaw in support of their proposition that the statute of limitations is subject to the doctrine of equitable tolling based on fraudulent concealment, and the Court rejects this argument in light of the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). In *Lampf*, the Supreme Court held that although time limits in lawsuits are subject to equitable tolling, "it is evident that [this venerable principle] principle is fundamentally inconsistent with the 1–and–3–year structure." *Id.* The Court explained that "[t]he 1–year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary." *Id.* In addition, the 3–year limit is a period of repose that serves as a cutoff and, therefore, is inconsistent with tolling. *Id.* Accordingly, tolling principles also do not apply to the 3–year period of repose. *Id.* Thus, the Court finds the plaintiffs' assertion that the statute of limitations should be tolled based on the fraudulent concealment of Pace's involvement in the scheme is without merit. *See Lampf*, 501 U.S. at 363, 111 S.Ct. at 2782; *Dafofin*, 2001 WL 940632 (explaining that although doctrine of equitable tolling applies in fraud cases, it does not apply in cases brought under the Securities Acts); *Komanoff v. Mabon, Nugent & Co.*, 884 F.Supp. 848, 853 (S.D.N.Y.1995) (declining to apply doctrine of fraudulent concealment after the Supreme Court's decision in *Lampf*); *Falik v. Parker Duryee Rosoff & Haft*, 869 F.Supp. 228, 232 (S.D.N.Y.1994); *Siemens v. Atlantic Richfield Co.*, No. 93 Civ. 1126 (LAP), 1994 WL 86368 (S.D.N.Y. March 16, 1994); *Cohen v. Prudential–Bache, Sec.*, 777 F.Supp. 276, 279 (S.D.N.Y.1991) ("Whereas equitable tolling generally applies in fraud cases, the doc-

trine does not apply to claims for securities fraud under section 10(b)."); *see also Tregenza v. Great Am. Comms. Co.*, 823 F.Supp. 1409, 1415 (N.D.Ill.1993) ("A party cannot both have inquiry notice and merit equitable tolling."); *Manning v. Maloney*, 787 F.Supp. 433, 436 (M.D.Pa.1992) ("Equitable tolling under the doctrine of fraudulent concealment does not apply to [Securities and Exchange Act] actions."); *In re Rospatch Sec. Litig.*, Nos. 90 Civ. 805, 90 Civ. 806, 90 Civ. 85, 1991 WL 335253 (W.D.Mich. Oct. 11, 1991) ("*Lampf* overruled any equitable tolling in prior law.").

The Second Circuit recognized this limitation on equitable tolling in *Dodds v. Cigna*, 12 F.3d 346 (2d Cir.1993), in which it held that where, as here, a plaintiff is on inquiry notice, the statutory period is "tolled" only so long as the plaintiffs have "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Id.* at 350; *see Dafofin*, 2001 WL 940632; *Siemens*, 1994 WL 86368. Thus, although the plaintiffs are not entitled to an equitable tolling of the statute of limitations, the Court must consider their allegations concerning Pace's attempt to conceal his identity and involvement in the statute of limitations equation.

■■■ The Court has determined that as of October 9, 1996, the plaintiffs were on inquiry notice of the probability that they had been defrauded and, thus, had a duty to exercise reasonable diligence in investigating the alleged fraud, which duty commenced on that date. *See Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000); *Dodds*, 12 F.3d at 350. Because Pace was added as a defendant on February 17, 1999, for the plaintiffs' complaint to be timely, a reasonable investor of ordinary intelligence conducting a reasonably diligent investigation must have been unable to discover Pace's involvement in the fraud prior to February 18, 1998. *See* 15 U.S.C.

§§ 77m, 78i(e). Thus, the question presently before the Court is whether a reasonable investor of ordinary intelligence performing a reasonably diligent investigation into the facts underlying Sterling Foster's scheme should have discovered Pace's involvement in the scheme prior to February 17, 1998. *See Rothman*, 220 F.3d at 97 (holding that where the plaintiff has received inquiry notice, the date of discovery for the purpose of the statute of limitations is the date that the plaintiff, having obtained inquiry notice and "in the exercise of reasonable diligence," "should have discovered the fraud"); *Dodds*, 12 F.3d at 350. Assuming that the facts in the complaint are true and drawing all reasonable inferences in the plaintiffs' favor, *see Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997); the Court finds that the answer to that question is, "No," and thus, the plaintiffs' claims survive Pace's statute of limitations challenge.

First, although Pace was working with Lieberman to run Sterling Foster, he intentionally concealed his involvement in Sterling Foster and in the firm's business dealings throughout the time in which the plaintiffs were allegedly defrauded. Thus, even if the plaintiffs had exercised reasonable diligence in investigating the fraud, it would have been extremely difficult for them to discover Pace's involvement when that activity was being purposefully concealed. Given that the reason for Pace's secrecy was due to the fact that he was trying to hide his relationship with Sterling Foster from the NASD, which had suspended him from associating with NASD firms such as Sterling Foster, it is reasonable to presume that Pace's name would not be on any Sterling Foster documents, his phone number would not be in the company directory, and his office would not be located within the complex used by Sterling Foster. Accordingly, the Court finds that it would be very difficult for a reasonable investor of ordinary intelligence pursing a reasonable investigation of the facts underlying the allegations of fraud to learn of the details of Pace's identity much less the details of his involvement in Sterling Foster's alleged scheme.

Second, the Government did not indict Pace on securities fraud charges arising out of the same allegations that are the basis of this case until November 9, 1998. It is reasonable to presume that the reasonable investor of ordinary intelligence would not have the financial backing and investigative resources of the federal Government at his disposal. Thus, although it is not conclusive evidence, the fact that Pace was not indicted until November 9, 1998 provides some support for the Court's conclusion that a reasonable investor of ordinary intelligence exercising reasonable diligence in his investigation would not have learned of Pace's involvement in the scheme by February 17, 1998.

The Court's conclusion that a reasonable investor would have learned the facts underlying the Bear Stearns Defendants' involvement but not Pace's connection to the scheme is not inconsistent because the two situations are easily distinguished. An investor of ordinary intelligence conducting a reasonably diligent investigation could be expected to have learned about the Bear Stearns Defendants' connection to Sterling Foster prior to February 17, 1998, because the fact that small investment banks such as Sterling Foster generally hire clearing brokers to clear their trades is public knowledge easily obtained by anyone researching small investment banks, IPO underwritten by such institutions, or how trades are cleared. As discussed above, the next logical step of the reasonable investor in this case would be to learn the identity of that broker. On the other

hand, the secret and allegedly illegal control of banks is not a subject readily available to the general public, or even experts in the financial industry. Therefore, the Court's conclusion that a reasonable investor of ordinary intelligence exercising reasonable diligence should have discovered the facts underlying the Bear Stearns Defendants' involvement in the fraud prior to February 17, 1998, but could not have discovered the facts underlying Pace's involvement by that same date is entirely consistent.

The Court finds Pace's arguments to the contrary to be unpersuasive. Pace contends that the plaintiffs should have known of his involvement in the allegedly fraudulent scheme prior to February 17, 1999, because he was mentioned in the plaintiffs' original individual complaints and in the First Amended Complaint. The complaints in *Rogers*, 97 CV 189, *Smith*, 97 CV 610, and *Wright*, 97 CV 1689, allege that K.A.M. Group, Inc. ("K.A.M."), an entity owned and controlled by Pace was a Selling Securityholder in the Embryo and Com/Tech offerings. These complaints also allege that Dune Holdings, Inc. ("Dune"), another entity owned and controlled by Pace and his wife, was a Selling Securityholder in the Embryo, Com/Tech, and Advanced Voice offerings (*see* complaint in 97 CV 189, ¶ 47; complaint in 97 CV 610, ¶ 47; complaint in 97 CV 1689, ¶ 50). In *Petit*, 97 CV 3775, and in the First Amended Complaint, the plaintiffs mentioned the brokerage firm, Rooney–Pace, which they stated had engaged in practices criticized by the SEC and had perpetrated a scheme involving "shelf shares" similar to the scheme employed by Sterling Foster (*see* First Amended and Consolidated Class Action Complaint, ¶ 44).

A reasonable investor on inquiry notice of a probability that he has been defrauded, who is conducting a reasonably diligent

investigation and who knew that two of Pace's companies were Selling Securityholders in three of the allegedly fraudulent offerings, cannot be deemed able to discover Pace's involvement in the alleged scheme. As potential plaintiffs were trying to determine whether they were victims of Sterling Foster's alleged fraud, Pace was actively concealing his connection with Sterling Foster in order to avoid raising the suspicions of the NASD. Indeed, Pace's office was in Manhattan, not Melville, where Sterling Foster was located. Assuming that Pace took other steps to distance himself from Sterling Foster, the Court finds that a reasonable investor of ordinary intelligence would not have discovered that Pace was secretly operating Sterling Foster.

Viewing the allegations in the light most favorable to the plaintiffs, *Koppel*, 167 F.3d at 127; *Jaghory*, 131 F.3d at 329, the Court finds that the plaintiffs have pled sufficient facts to demonstrate that a reasonable person of ordinary intelligence conducting a reasonably diligent investigation could not have discovered Pace's role in the fraudulent scheme prior to February 17, 1998. Of course, the plaintiffs, at the proper time, will have to support their contentions of reasonable diligence with evidence. However, for the purposes of this motion to dismiss, the Court assumes the plaintiffs' allegations to be true. Accordingly, Pace's motion to dismiss the plaintiffs' federal securities claims as time-barred is denied.

#### d. Applewoods

■ Applewoods argues that the claims against it are barred by the statute of limitations, because the October 8, 1996 *Bloomberg Newswire* article and the October 9, 1996, article from *The Wall Street Journal* put the plaintiffs on inquiry notice of the potential claims against the compa-

ny that were sufficient to commence the statute of limitations. Applewoods states that the plaintiffs did not add it as a defendant until the filing of the First Amended and Consolidated Class Action Complaint on December 1, 1997. Accordingly, Applewoods contends that because the plaintiffs failed to sue it within one year of receiving inquiry notice, the claims against it are barred by the statute of limitations.

On the other hand, the plaintiffs argue that neither the *Bloomberg Newswire* nor *The Wall Street Journal* article placed them on inquiry notice with regard to Applewoods because neither article mentioned the company. The plaintiffs further argue that even if the articles were sufficient to place them on inquiry notice regarding the probability of fraud by Applewoods, any suspicions the plaintiffs may have had would have been allayed by the company's subsequent positive announcements and news.

The Court finds the plaintiffs' argument to be without merit. Throughout the complaint and in opposition to motions by all of the other defendants, the plaintiffs have consistently, though perhaps implicitly, conceded that the two news articles regarding Sterling Foster's stock-fraud scheme placed them on inquiry notice. For them to argue now that they were not on inquiry notice because those articles did not specifically mention Applewoods is disingenuous.

Although the *Bloomberg Newswire* and *The Wall Street Journal* articles do not mention Applewoods, they describe the NASD complaint charging Sterling Foster with securities fraud as their largest case in recent years. The articles explain that the charges stemmed from IPOs and state that Sterling Foster made $53 million in illicit profits. Given the large size of the scheme described in the articles and the similar *modus operandi* used by Sterling

Foster in all the allegedly fraudulent IPOs, the Court finds that the articles create circumstances that would suggest to an investor of ordinary intelligence, who purchased shares of Applewoods and, thus, had dealings with Sterling Foster, the probability that he has been defrauded. *See Dodds v. Cigna,* 12 F.3d 346, 350 (2d Cir.1993). Accordingly, the Court finds that as of October 9, 1996, the plaintiffs were on inquiry notice with regard to potential claims against Applewoods.

Applewoods was added as a defendant when the First Amended Complaint was filed on December 1, 1997. Applying the one-year statute of limitations, the plaintiffs must have "discovered" the facts underlying the securities fraud claims no earlier than December 1, 1996. *See* 15 U.S.C. §§ 77m, 78i(e); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 361–62, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). Contrary to Applewoods' assertion, the date the duty of inquiry arises in a case where the plaintiff has received inquiry notice is not the date of discovery for the purpose of commencing the statute of limitations. *See Rothman v. Gregor,* 220 F.3d 81, 97 (2d Cir. 2000). Rather, the date of discovery is the date that the plaintiff, having obtained inquiry notice, "in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Id.* Therefore, whether the plaintiffs' claims against Applewoods are time-barred turns on whether a reasonable investor of ordinary intelligence exercising reasonable diligence in investigating the fraud would have discovered fraud in connection with the Applewoods IPO prior to December 1, 1996. *See* 15 U.S.C. §§ 77m, 78i(e) (one-year statute of limitations from date of discovery); *Rothman,* 220 F.3d at 97; *Dodds,* 12 F.3d at 350.

The plaintiffs received actual notice that Sterling Foster had defrauded investors in the sum of $53 million in regard to IPOs very similar to that for Applewoods on October 9, 1996. A reasonable investor of ordinary intelligence exercising reasonable diligence in investigating those allegations would not have discovered the facts underlying the alleged fraud any earlier than nine weeks later, on December 1, 1996. Indeed, nine weeks is a very short period of time within which to conduct such an investigation, even with the attention the allegations of fraud received from the press. Accordingly, the Court finds that the plaintiffs' claims against Applewoods are not time barred, and Applewoods' motion to dismiss the federal securities claims on that ground is denied. *See* 15 U.S.C. §§ 77m, 78i(e); *Rothman,* 220 F.3d at 97; *Dodds,* 12 F.3d at 350.

### e. The Individual Applewoods Defendants

Like Applewoods, the IADs were not added as defendants until December 1, 1997, when the First Amended Complaint was filed. Also like Applewoods, the IADs argue that the federal securities claims are time-barred because the plaintiffs received inquiry notice on October 9, 1996, but did not add the IADs as named defendants until more than one year later, on December 1, 1997. The Court denies the IADs' motion to dismiss the complaint on this ground for the same reason it denied the identical argument raised by Applewoods itself.

However, the IADs raise a second argument in support of their motion to dismiss the federal securities claims against them as time-barred. In a decision and order dated February 12, 1999, this Court dismissed the complaint as against the IADs on the ground that the plaintiffs had failed to effectuate proper service of process within 120 days of the filing of the First Amended Complaint. In its decision, the Court noted that the plaintiffs never filed papers in opposition to the motion by the IADs to dismiss the complaint on that ground. The Court also granted leave to the plaintiffs to file a Second Amended Complaint and directed that they serve the defendants, including the IADs with a summons and a Second Amended Complaint within 20 days of the date of the Court's order.

The IADs contend that when the Court dismissed the First Amended Complaint against them, it "placed them in a position of never having been sued" (Individual Applewoods Defendants' Mem. in Supp. of Mot. to Dismiss, p. 8). These defendants maintain that the plaintiffs clearly had actual notice of the IADs' alleged involvement in the fraud as of December 1, 1997, the date of the First Amended Complaint, because they were named as defendants in that complaint. Therefore, conclude the IADs, the plaintiffs' failure to file a complaint by December 1, 1998 naming them as defendants renders the plaintiffs' claims against them time-barred.

On the other hand, the plaintiffs argue that the Second Amended Complaint relates back to the date of the First Amended Complaint, and the claims against the IADs are timely.

The Court's February 12, 1999 decision does not specify whether the claims against the IADs were dismissed with or without prejudice. However, the Court granted the plaintiffs leave to file a Second Amended Complaint and directed the plaintiffs to serve that complaint, together with a summons, on each of the IADs. Accordingly, the Court now finds that its February 12, 1999 dismissal of the First Amended Complaint was without prejudice.

Nevertheless, "where the action has been dismissed without prejudice, a plaintiff's subsequent court filing is vulnerable

to a time-bar because the dismissal in and of itself does not halt the running of the statute of limitations period, even though designated to be without prejudice." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir.1996); *Jewell v. County of Nassau*, 917 F.2d 738, 740–41 (2d Cir.1990) (holding that judicial stay of a pending action, "rather than dismissal, albeit expressed to be without prejudice, is the only means by which the bar of limitations may be avoided"). To ensure that unfair prejudice does not result from a dismissal without prejudice, courts "have protected a plaintiff's rights with the doctrine of equitable tolling." *Johnson*, 86 F.3d at 11. "Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances." *Id.* at 12. The Second Circuit has applied the doctrine "as a matter of fairness" where a plaintiff has been " 'prevented in some extraordinary way from exercising his rights, or h[as] asserted his rights in the wrong forum.' " *Id.* (quoting *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir.), *cert. den.*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)). However, a party seeking to invoke the doctrine must pass with reasonable diligence through the period it wishes to have tolled. *Id.* (citing *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993)); *see also, Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir.2002).

▬ Applying these standards to the facts of the present case, the Court finds that the federal securities claims against the IADs are barred by the statute of limitations. Clearly, the plaintiffs had actual notice of the alleged fraud by the IADs on December 1, 1997, when the plaintiffs first named the IADs as defendants to this action. The Court's dismissal of the claims against the IADs did not halt or restart the statute of limitations. *See Johnson*, 86 F.3d at 11; *Jewell*, 917 F.2d

at 740–41. Rather, their claims became vulnerable to a time bar. *See Johnson*, 86 F.3d at 11; *Jewell*, 917 F.2d at 740–41. Thus, when the plaintiffs asserted the federal securities claims against the IADs on February 17, 1999, more than one year had elapsed since the plaintiffs had actual notice of the IADs' alleged involvement in the scheme. Accordingly, the federal securities claims are barred by the statute of limitations. *See* 15 U.S.C. §§ 77m, 78i(e).

▬ The Court further finds that the plaintiffs are not entitled to have any period of time equitably tolled. The plaintiffs do not ask this Court to invoke the doctrine of equitable tolling. They oppose the motion to dismiss on entirely different grounds, by relying on Rule 15(c) of the Fed.R.Civ.P. As the plaintiffs have failed to explain the diligence with which they acted, the Court finds that the plaintiffs do not merit equitable tolling. *See Chapman*, 288 F.3d at 512 ("[T]he burden of proving that tolling is appropriate rests on the plaintiff."); *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir.2000).

The absence of an argument by the plaintiffs notwithstanding, the Court has examined the facts before it and determines that this is not a situation that calls for equitable tolling. The plaintiffs had notice as of August 28, 1998, that they might not have served the IADs properly, because those defendants moved to dismiss the First Amended Complaint on improper service of process grounds on that date. Despite this notice, the plaintiffs did not attempt proper service of process and did not request an extension of time in which to properly serve these defendants. The plaintiffs did not even oppose the motion by the IADs to dismiss the complaint on the ground that they had not been properly served. Notably, the Second Circuit has held that practitioners do not act with due diligence if they attempt to commence

an action using improper service of process. *South v. Saab Cars USA, Inc.*, 28 F.3d 9, 12 (2d Cir.1994). Clearly, the plaintiffs were not prevented in "some extraordinary way" from asserting their rights against the IADs, and the Court declines to apply the doctrine of equitable tolling to the facts of this case. *See Johnson*, 86 F.3d at 12 (suggesting that the Second Circuit has applied the doctrine of equitable tolling where extraordinary circumstances have prevented the plaintiff from asserting his rights).

■ The plaintiffs argue that the federal securities claims against the IADs are not time-barred because the addition of those defendants in the Second Amended and Consolidated Class Action Complaint relates back to the claims in the First Amended and Consolidated Class Action Complaint pursuant to Rule 15(c). An amendment to a pleading that attempts to add a new party will relate back to the date of the original pleading when (1) the claim arises out of the same conduct originally pleaded; and (2) within 120 days of the original filing date, the party to be brought in by amendment "(A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed. R.Civ.P. 15(c)(3); *Soto v. Brooklyn Correctional Facility*, 80 F.3d 34, 35 (2d Cir. 1996). For the plaintiffs' Second Amended Complaint to relate back to the date of their First Amended Complaint, they must show that their failure to name the IADs was due to a "mistake concerning the identity of the proper party." *Soto*, 80 F.3d at 35 (quoting Fed.R.Civ.P. 15(c)(3)(B)); *Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir.1994) (holding that where the plaintiff knew the identities of the defendants but chose not to name them, the failure to name them is not a "mistake" even if the plaintiff met the other requirements of Rule 15(c)).

To establish "mistake" under Rule 15(c)(3), a plaintiff must show either factual mistake as to the name of the party to be sued (*i.e.*, that he misapprehended the identities of the individuals he wished to sue) or legal mistake concerning the requirements of the cause of action (*i.e.*, that he misunderstood the legal requirements of his cause of action). *See Soto*, 80 F.3d at 35–36 (holding that the amended complaint "related back" to the date of the original complaint because the plaintiff's failure to name the defendants in the original complaint, despite knowing their identities, was due to the fact that he did not know the technicalities of constitutional tort law and, thus, was "mistaken"); *Cornwell*, 23 F.3d at 705; *Sealey v. Fishkin*, No. 96 Civ. 6303 (RR), 1998 WL 1021470 (E.D.N.Y. Dec.2, 1998).

The failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a "mistake." *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469–70 (2d Cir.1995) (holding that where the court informs the plaintiff, within the statute of limitations, that he must add the names of the individual defendants, and the plaintiff fails to do so, he is not "mistaken" for the purposes of Rule 15(c)), *modified on other grounds*, 74 F.3d 1366 (1996).

Here, the plaintiffs clearly knew the identities of the IADs and the fact that they had to be named as defendants in the action. Indeed, they named the IADs in the First Amended Complaint. The fact that the IADs did not remain as named defendants was the result of the plaintiffs' failure to timely and properly serve them not due to a mistake in identity. Moreover, the plaintiffs make no attempt to excuse their failure to timely add the IADs

on the ground of mistaken identity, nor would it be reasonable for them to do so. *Bass v. World Wrestling Federation Entertainment, Inc.,* 129 F.Supp.2d 491, 508 (E.D.N.Y.2001). Since the new names were added not to correct a factual or legal mistake but, rather, as part of an attempt to correct an error in service of process, the plaintiffs cannot claim mistake of identity, and their claims against the IADs cannot relate back to the date of the original complaint. *See* Fed.R.Civ.P. 15(c); *Soto,* 80 F.3d at 35; *Barrow,* 74 F.3d at 1367; *Cornwell,* 23 F.3d at 705.

In sum, the federal securities claims against the IADs are time-barred. The plaintiffs have failed to meet their burden of showing that they are entitled to an equitable tolling of the statute of limitations, or that the claims against the IADs relate back to the date of the original complaint. Accordingly, the Court grants the motion by the IADs to dismiss the federal securities claims as against them, and those claims are dismissed.

### 3. The Claims Brought Pursuant to Section 11 of the Securities Act

### a. The Alleged Omissions are Not Immaterial

The Sterling Foster Defendants, Pace and Novich, and the Shalek Defendants move to dismiss the plaintiffs Section 11 claims on the grounds that the alleged misstatements or omissions in the prospectuses were not material, and any claim to the contrary is belied by the disclosures and cautionary warnings in the prospectuses themselves. Section 11 of the Securities Act provides that any signer of the registration statement, officer of the issuer, or underwriter may be held liable to purchasers of the registered securities "if any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required

to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 "was designed to assure compliance with the disclosure provisions of the Act by imposing stringent standards of liability on the parties who play a direct role in a registered offering.... Although limited in scope, § 11 places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

As the statute makes clear, to state a cognizable claim under Section 11, a plaintiff must demonstrate that the prospectus contains "a misstatement or omission concerning a material fact." *In re Donna Karan Intern. Sec. Litig.,* No. 97 Civ.2011 CBA, 1998 WL 637547 *4 (E.D.N.Y. Aug. 18, 1998); *see also Steinberg v. PRT Group, Inc.,* 88 F.Supp.2d 294, 299–300 (S.D.N.Y.2000). An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *see Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132); *Steinberg,* 88 F.Supp.2d at 300. A misrepresentation is material under Section 11 when an investor would attach importance to it in making an investment decision. *See Basic Inc.,* 485 U.S. at 231, 108 S.Ct. at 983; *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 731 (2d Cir.1987).

Although a court may dismiss a claim on the ground that a misstatement or omission was not material, "the standard for doing so is high." *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 227 (S.D.N.Y.1999). "[A] complaint may not

properly be dismissed pursuant to Rule 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Moreover, a court deciding a motion to dismiss shall be mindful that the issue of whether a statement or omission is material is usually a question for the fact finder. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133; *Mendell v. Greenberg,* 927 F.2d 667, 673 (2d Cir.1990).

▆▆▆ The plaintiffs assert that the prospectuses contained material omissions because they failed to disclose the secret agreements between Sterling Foster and the respective Selling Securityholders by which Sterling Foster agreed to release the Selling Securityholders from their lock-up agreements immediately following the various offerings. The omissions also failed to disclose that Sterling Foster further agreed to purchase the Selling Securityholders' shares at prices above those paid by the Selling Securityholders when they purchased the shares but well below the market price for the shares. Had the plaintiffs been aware of these agreements, they would have known that anywhere from one-third-to-three times the number of shares in the offering would be released into the aftermarket shortly following the offering. Similarly, the plaintiffs also would have known that Sterling Foster had, at its disposal, a number of shares that was one-third-to-three times the number of shares offered to the public. Therefore, the existence of the secret agreements could "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132. As such, the Court finds that the omissions from the prospectuses of the secret agreements between the Sell-

ing Securityholders and Sterling Foster is not "so obviously unimportant to a reasonable investor" that they are not material as a matter of law. *Goldman,* 754 F.2d at 1067. Accordingly, the Court cannot find that the plaintiffs' allegations are not material as a matter of law.

Nevertheless, the Sterling Foster Defendants argue that there cannot have been a material omission from the Applewoods prospectus because the Applewoods Selling Securityholders were not bound to lock-up agreements and, therefore, could not have had a secret agreement with Sterling Foster for their early termination. Similarly, the Shalek Defendants argue that a statement in the ML Direct prospectus that Sterling Foster had agreed to purchase shares from the Selling Securityholders at discounted rates would not have added anything to the "total mix" of information already provided in the prospectus because the sale to Sterling Foster would have been contingent on Patterson Travis releasing the Selling Securityholders from their lock-up agreements.

The Court agrees that any secret agreement between Sterling Foster and the Applewoods and ML Direct Selling Securityholders could not have involved releasing the shares from the lock-up agreements. Nevertheless, the Second Amended Complaint also alleges that Sterling Foster and the Applewoods and ML Direct Selling Securityholders agreed that Sterling Foster would purchase their shares at a substantial discount to the prevailing market price. The Court finds that the omission of these agreements from the prospectuses "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132, because the agreements substantially alter the number of shares available to Sterling Foster and offered to the

public as well as the market price of those shares. Based on the allegations in the Second Amended Complaint, the Court cannot conclude as a matter of law and at this early stage in the litigation that the omissions of the secret agreements from the Applewoods and ML Direct prospectuses were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman,* 754 F.2d at 1067.

 The Sterling Foster Defendants, Pace and Novich, and the Shalek Defendants also argue that the prospectuses "bespoke caution" that (1) the Selling Securityholders owned shares of the various companies; (2) Sterling Foster could release the Selling Securityholders from their lock-up agreements at any time and for any reason; and (3) the release of the Selling Securityholders' shares would adversely affect the prices for the securities offered through the prospectuses. Therefore, argue the defendants, the prospectuses fully informed the plaintiffs about the very risks they now complain were not disclosed.

Under the "bespeaks caution" doctrine, "a misrepresentation or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." *Milman v. Box Hill Systems Corp.,* 72 F.Supp.2d 220, 230 (S.D.N.Y.1999); *see Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986). For the "bespeaks caution" doctrine to apply, the cautionary language must be too prominent and specific to be disregarded and must warn potential investors of exactly the risk the plaintiffs claim was not disclosed. *See Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir.1996). However, courts have declined to apply the doctrine when the defendants knew the misrepresentation or omission was false when it was made. *See In re Prudential Sec. Inc.*

*Ltd. Parnerships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996).

The Court now turns to the various prospectuses, all of which were supplied by the defendants in support of their motions to dismiss the Second Amended Complaint. *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991) (the court examined the prospectus provided by the defendants where the plaintiff failed to submit a copy). All of the prospectuses registered significant numbers of securities that had been issued to Selling Securityholders prior to the effective date of the respective registration statement. The Advanced Voice prospectus registered 1,519,756 shares of common stock; the Com/Tech prospectus registered 1,360,000 shares of common stock; the Embryo prospectus registered 3,030,000 shares of common stock; the Applewoods prospectus registered 480,000 shares of common stock; the Lasergate prospectus registered 800,000 units (one common share and two warrants to purchase common stock); and the ML Direct prospectus registered 2,400,000 shares of common stock, all of which belonged to the Selling Securityholders. The prospectuses for Advanced Voice, Com/Tech, Embryo, Lasergate, and ML Direct contained lock-up agreements which stated that the Selling Securityholders agreed not to sell their shares for a certain period of time, generally between 12 and 24 months. The Applewoods prospectus did not contain a lock-up agreement but, rather, stated that "[t]he securities held by the Selling Securityholders may be resold at any time following the date of this Prospectus" (Applewoods Prospectus, p. 44).

The five prospectuses that contained lock-up agreements also contained language allowing for the early release of shares. The Advanced Voice prospectus stated that the Selling Securityholders

would not sell their shares "without [Sterling Foster's] prior written consent," and informed investors that Sterling Foster had advised Advanced Voice "that it would consider releasing the lockup . . . based upon the facts and circumstances at the time of the request to release the lockup, including but not limited to, general market conditions, the price of the Company's securities, the liquidity of the trading market, and . . . the financial needs of the company" (Advanced Voice Prospectus, p. 41).

The Com/Tech prospectus states that the shares owned by the Selling Securityholders could be released at any time by Sterling Foster, whose release must be in writing (Com/Tech Prospectus, pp. 35, 38). However, the prospectus also stated, "As of the date of this Prospectus, the freely tradeable securities of the Company will be 1,000,000 shares of Common Stock" (Com/Tech Prospectus, p. 35). The Com/Tech prospectus advised that sales of securities by the Selling Securityholders would have an adverse effect on the market prices of the securities in the offering (Com/Tech Prospectus, p. 35).

The Embryo prospectus informed potential investors that the shares owned by the Selling Securityholders could be released by Sterling Foster at the underwriter's sole discretion (Embryo Prospectus, cover page and p. 36). The prospectus advised that Sterling Foster could release the shares "at any time" after the securities subject to Sterling Foster's over-allotment option had been sold, or the option had expired (Embryo Prospectus, cover page). The Embryo prospectus further informed potential investors that Sterling Foster "ha[d] no agreements or understandings with any of the Selling Securityholders with respect to release of the securities prior to [the end of the lock-up period], and has no present intention of releasing any or all of such securities prior to such

periods" (Embryo Prospectus, cover page). However, the prospectus warned that in recent offerings, Sterling Foster had released the Selling Securityholders' shares "substantially prior to the expiration of [the lock-up] periods" (Embryo Prospectus, cover page). Like the Com/Tech prospectus, the Embryo prospectus stated that the sale of the shares owned by the Selling Securityholders would have an adverse effect on the market price of the securities in the offering (Embryo Prospectus, cover page).

The Lasergate prospectus informed potential investors that the Selling Securityholders could sell their shares prior to the expiration of the lock-up agreements provided they obtained written consent from Sterling Foster (Lasergate Prospectus, p. 40).

The ML Direct prospectus, which was prepared by Patterson Travis not Sterling Foster, stated that Patterson Travis retained the sole discretion to release the Selling Securityholders from their lock-up agreements (ML Direct Prospectus, p. 34).

Clearly, the five prospectuses that contained lock-up agreements informed the investors that the shares owned by the Selling Securityholders could be released prior to the expiration of the lock-up agreement. In addition, the Embryo prospectus cautions investors that, in recent offerings, Sterling Foster had released the Selling Securityholders from their lock-up agreements "substantially earlier" than the expiration of those agreements. Further, the Com/Tech and Embryo prospectuses warn that such a release may have an adverse effect on the market price of the shares in the offering.

However, the plaintiffs do not allege that the defendants failed to advise them of the possibilities regarding the lock-up agreements and the risks of a subsequent price drop. Rather, the plaintiffs specifi-

cally charge that at the time of the six offerings, the defendants had actual—not hypothetical—knowledge that the shares owned by the Selling Securityholders would be released, and that Sterling Foster would purchase them at a price that enabled the Selling Securityholders to make a profit but that was a substantial discount to the prevailing market price. In none of the prospectuses do the defendants divulge the current reality of the secret release-and-purchase agreements or allude that Sterling Foster and the Selling Securityholders had even discussed taking such a step.

The defendants' disclosures warning of the possibility that the Selling Securityholders' shares could be released do not counter the plaintiffs' allegations that, at the time the prospectuses became effective, the defendants had already agreed that the shares would be released and purchased by Sterling Foster because the cautionary language does not warn potential investors of exactly the risk that the plaintiffs claim was denied. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996) (holding that cautionary language that renders misstatements or omissions immaterial must "warn investors of exactly the risk that plaintiffs claim was not disclosed"). Hypothetical warnings, such as the ones the defendants placed in the prospectuses at issue in this case, "will not eliminate liability based on the failure to disclose present knowledge." *Milman*, 72 F.Supp.2d at 231. The defendants' argument to the contrary "disregards a fundamental principal in securities law analysis: the statements in a [p]rospectus are to be judged as of the effective date of the offering." *Feiner v. SS&C Technologies*, 11 F.Supp.2d 204, 209 (D.Conn.1998) (citing 15 U.S.C. § 77k(a)).

Further, where, as here, the defendants allegedly knew that their omission made other statements in the prospectuses misleading, *see* 15 U.S.C. § 77k(a), no degree of cautionary language will protect them. *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996). Indeed, the doctrine of bespeaks caution does not protect "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Id.* Therefore, at this stage of the proceedings, the Court finds that the doctrine of bespeaks caution is inapplicable to the case at hand and, therefore, that the omissions from the prospectus cannot be considered immaterial as a matter of law.

#### b. Reliance

 Pace and Novich argue for dismissal of "the federal securities claims" on the ground that the plaintiffs have failed to plead reliance on any misrepresentations or omissions made by either defendant. Proof of reliance generally is not required to establish a Section 11 claim. *See* 15 U.S.C. § 77k(a); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). To establish a *prima facie* case of a Section 11 violation, a plaintiff must show that he (1) purchased a security issued pursuant to a registration statement; and (2) the offering document contained a material omission or misstatement. *See id.* Section 11 is limited in scope and places very little burden on the plaintiff. *See id.* Indeed, "[t]he section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on parties who play a direct role in a registered offering." *Id.*

Nevertheless, in limited circumstances, a Section 11 plaintiff must prove reliance. If the plaintiff "has acquired the security after the issuer has made available to its security holders an earning statement cov-

ering a period of at least twelve months beginning after the effective date of the registration statement," the plaintiff must establish that he has relied upon the misrepresentation or omission. 15 U.S.C. § 77k(a). Pace and Novich do not contend that earning statements were issued for any of the Issuer Defendants. Therefore, the Court lacks sufficient facts to determine whether the plaintiffs in this case were required to plead or prove reliance. As this litigation progresses, the facts may show that some of the plaintiffs must establish reliance in order to ultimately succeed. However, without sufficient information regarding the issuance of earning statements, the Court is constrained to deny the motion by Pace and Novich to dismiss the Section 11 claims.

### c. Oral Misrepresentations

 Although their papers are somewhat vague, it appears that the Sterling Foster Defendants argue for dismissal of the Section 11 claims that are based on oral misrepresentations made by Hawley, Paulson, and other members of the Broker Class on the ground that those oral misrepresentations are belied by the disclosures of material facts and risks of investment in the prospectuses. The plain language of Section 11 limits claims brought pursuant to that section to those arising out of material omissions or misstatements in the written registration statement or prospectus itself. 15 U.S.C. § 77k. Thus, the defendants cannot be held liable for oral omissions under Section 11, and to the extent the plaintiffs' Section 11 claims are based on oral misrepresentations by the Sterling Foster Defendants, those claims are dismissed. Accordingly, the Court declines to address the substance of Sterling Foster's argument that the alleged oral misrepresentations are belied by cautionary language in the prospectus.

### d. The Section 11 Claims are Pled With Sufficient Particularity

In an initial paragraph that appears to apply to all of their arguments, the Sterling Foster Defendants assert that the complaint must be dismissed because the plaintiffs have not pled fraud with sufficient particularity. In addition, the Shalek Defendants argue that the plaintiffs' federal securities claims must be dismissed because "the plaintiffs have failed to make any factual allegations supporting the existence of the alleged agreement [between Sterling Foster and the Selling Securityholders]." The Court construes both of these arguments liberally and finds that these defendants are claiming that the plaintiffs failed to plead their Section 11 claims with the particularity required by Rule 9(b) of the Fed.R.Civ.P.

 Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The Second Circuit has not addressed whether the pleading standards of Rule 9(b) apply to claims brought pursuant to Section 11 of the Securities Act, and there is some disagreement within the Circuit about this issue. *See Griffin v. PaineWebber, Inc.*, 84 F.Supp.2d 508, 513 (S.D.N.Y.2000) (collecting cases); *see also, In re Ziff–Davis Inc. Sec. Litig.*, No. 98 Civ. 7158 SWK, 2000 WL 877006 (S.D.N.Y. June 30, 2000) (noting the disagreement among the courts and pointing the reader to the cases cited in *Griffin* ). However, as noted by Judge Sweet in *Griffin,* the courts that have held Rule 9(b) to be applicable to Section 11 claims have done so in cases where the complaint contained actual allegations of fraud. *Griffin,* 84 F.Supp.2d at 513; *see In re Ziff–Davis,* 2000 WL 877006; *Fein-*

*er,* 11 F.Supp.2d at 211 (stating that the courts that have applied Rule 9(b) to claims brought under Sections 11 and 12(2) have done so when the claims themselves are grounded in fraud and listing the cases in which those decisions were made). Further, courts deciding cases in which the Section 11 claims were not based on fraud have held that Rule 9(b) does not apply to these claims because the cause of action does not require proof of fraud. *See In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309 (8th Cir.1997); *In re In–Store Advertising Sec. Litig.,* 878 F.Supp. 645, 650 (S.D.N.Y.1995); *Nelson v. Paramount,* 872 F.Supp. 1242, 1246 (S.D.N.Y.1994); *In re AnnTaylor Stores Sec. Litig.,* 807 F.Supp. 990, 1003 (S.D.N.Y.1992). The Court is persuaded by the reasoning of these courts and holds that Rule 9(b) does not apply to Section 11 claims that are not based on allegations of fraud.

Here, although the plaintiffs have alleged numerous claims involving fraud and various facts concerning a scheme to defraud, their Section 11 claims do not mention fraud or mistake. *See* Fed.R.Civ.P. 8(e)(2) ("A party may state as many separate claims or defenses as the party has regardless of consistency"). Indeed, the plaintiffs do not allege that the defendants' omissions or misrepresentations were based on an intent to deceive. Accordingly, at this point in the litigation, the Court finds that the plaintiffs' Section 11 claims are not grounded in fraud and, therefore, need not meet the heightened pleading standard of Rule 9(b). Accordingly, the motions by the Sterling Foster and Shalek Defendants to dismiss the claims on that ground are denied.

In sum, for the reasons stated above, the motions by the Sterling Foster Defendants, Pace and Novich, and the Shalek Defendants to dismiss the Section 11 claims are denied except that to the extent the plaintiffs' Sections 11 claims are based on oral misrepresentations, which claims are dismissed.

### 4. The Claims Brought Pursuant to Section 10(b) of the Exchange Act and Rule 10b–5 Promulgated Thereunder

The plaintiffs' claims under Section 10(b) and Rule 10b–5 are based on two theories: (1) material omission or misrepresentation; and (2) market manipulation. All six of the Section 10(b) and Rule 10b–5 claims allege (1) that the "defendants took steps to publish and make various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made ... not misleading" (complaint ¶¶ 308, 317, 326, 335, 343, 352); and (2) that the defendants engaged in a "scheme ... pursuant to which they knowingly or recklessly engaged in ... practices ... which operated to manipulate the market price of [the respective security]" (complaint ¶¶ 308, 317, 326, 335, 343, 352). Accordingly, the Court's analysis of the defendants' motions to dismiss these claims addresses both theories upon which the Section 10(b) and Rule 10b–5 claims are based.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibit fraudulent activities in connection with securities transactions. Section 10(b) makes it "unlawful for any person ... [t]o use or employ in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of [Securities and Exchange Commission Rules]." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Securities and Exchange Commission under Section 10(b), prohibits any person from "mak[ing] any untrue statement of material fact or ... omit[ting] ... a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Rule 10b–5 also prohibits the employment of "any device, scheme or artifice to defraud." 17 C.F.R. § 240.10b–5(a).

■■■■ To state a claim under Section 10(b) and Rule 10b–5 based on a material omission or misrepresentation, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996) (citing *In re Time Warner Inc. Secs., Litig.*, 9 F.3d 259, 264 (2d Cir.1993)); *see Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). To state a claim under Section 10(b) and Rule 10b–5 against persons who employ manipulative and deceptive practices in a scheme to defraud, a plaintiff must allege: (1) that he was injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendants' deceptive and manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter. *In re Blech Sec. Litig.*, 961 F.Supp. 569, 582 (S.D.N.Y.1997) (*Blech II* ) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383–84, 47 L.Ed.2d 668 (1976)); *see Vandenberg v. Adler*, No. 98 Civ. 3544 WHP, 2000 WL 342718, *7 (S.D.N.Y. March 31, 2000); *see also Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir.1989); *Connolly v. Havens*, 763 F.Supp. 6, 10 (S.D.N.Y.1991).

■■■■ A complaint asserting securities fraud generally must satisfy the heightened pleading requirement of Rule 9(b) of the Fed.R.Civ.P., which requires fraud to be alleged with particularity. *Kalnit*, 264 F.3d at 138; *Ganino v. Citi-*

*zens Utilities Co.*, 228 F.3d 154, 168 (2d Cir.2000); *see* Fed.R.Civ.P. 9(b). Rule 9(b) requires that "[i]n all averments of fraud …, the circumstances constituting the fraud shall be stated with particularity." Fed.R.Civ.P. 9(b). Thus, a securities fraud allegation based on a material misrepresentation or omission shall " '(1) specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

■■■ Further, in 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 105–67, 109 Stat. 737, which makes the pleading requirements for securities fraud cases more demanding. *See Novak v. Kasaks*, 216 F.3d 300, 305–07 (2d Cir.2000). Thus, although the heightened pleading requirement of Rule 9(b) continues to apply, the more stringent pleading standards of the PSLRA govern an inquiry into the adequacy of the pleadings. *Novak*, 216 F.3d at 305–07. Under the PSLRA, in any securities fraud case alleging a material misrepresentation or omission,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b).

■■■ Courts have recognized that it is difficult to meet the particularity requirement of Rule 9(b) when pleading market manipulation claims because, unlike misrepresentation claims, "where some as-

pects of the time and place and other details of the defendant's activity are within the knowledge of the plaintiff as a matter of course, . . . the mechanism of the scheme is likely to be unknown to the plaintiffs." *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1291 (S.D.N.Y.1996) (*Blech I*); *see Vandenberg*, 2000 WL 342718 *5; *Blech II*, 961 F.Supp. at 580. Courts that have recognized this problem have held that "allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Blech II*, 961 F.Supp. at 580; *see Vandenberg*, 2000 WL 342718 *5. A claim of market manipulation under Section 10(b) and Rule 10b–5 need only specify: "(1) what manipulative acts were performed, (2) which defendants performed them, (3) and what effect the scheme had on the market for securities at issue." *Vandenberg*, 2000 WL 342718 (citing *Blech II*, 961 F.Supp. at 580).

### a. Scienter

■ To satisfy the scienter or state-of-mind element under Section 10(b) and Rule 10b–5, regardless of the theory upon which the claim is based, a plaintiff must allege " 'an intent to deceive, manipulate or defraud.' " *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir.2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)); *Kalnit*, 264 F.3d at 138. Under Rule 9(b) "[m]alice, intent, knowledge and other condition of mind may be averred generally." Fed.R.Civ.P. 9(b). Nevertheless, the relaxation of Rule 9(b)'s specificity requirement for scienter " 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.' " *Shields*, 25 F.3d at 1128 (quoting *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991)). Indeed, the purpose of Rule 9(b) is "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a

defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien*, 936 F.2d at 676. Therefore, in decisions prior to 1995, the Second Circuit held that in order to satisfy the purpose of Rule 9(b), plaintiffs must allege facts that "give rise to a strong inference of fraudulent intent." *Mills*, 12 F.3d at 1176; *see Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000).

The PSLRA also contains a scienter provision, which states:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). Following the passage of the PSLRA, the Second Circuit analyzed the statute's effect on the Court's scienter requirement in securities fraud cases and concluded that the PSLRA "did not change the basic pleading standard for scienter in this circuit." *Novak*, 216 F.3d at 310. Notably, nothing in the PSLRA indicates that the scienter standard is limited to cases involving material misrepresentations or omissions. Accordingly, this Court must determine whether the allegations of scienter underlying both theories alleged in the Second Amended Complaint "give rise to a strong inference of fraudulent intent." *Novak*, 216 F.3d at 307, 310.

The requisite "strong inference" may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d

at 1128; *see Novak*, 216 F.3d at 310; *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir.1993). "[W]hat is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of 'magic words such as motive and opportunity' but an allegation of facts showing that the type of particular circumstances that [the] case law has recognized will render motive and opportunity probative of a strong inference of scienter." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) (quoting *Novak*, 216 F.3d at 311).

Although the presence of a strong inference is highly dependent on the facts of the particular case, the Second Circuit has described four categories of cases that could give rise to a "strong inference" of fraudulent intent if the facts are sufficiently pled in the complaint. These are cases in which the defendants are alleged to have "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311; *see In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 315 (E.D.N.Y.2002); *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F.Supp.2d 559, 574 (E.D.N.Y.2002).

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (citations omitted), *overruled on other grounds United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989). To allege the requisite recklessness under the "conscious misbehavior or recklessness" prong, the plaintiffs must show that they alleged

conduct by the defendants which is "at the least, conduct that is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308 (quoting *Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)); *see In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000); *Rothman*, 220 F.3d at 90. "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996) (internal quotations and alterations omitted).

Typically, a complaint will satisfy the scienter requirement based on recklessness if it alleges that the defendants had "knowledge of facts or access to information contradicting their public statements," such that they "knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308; *see Kalnit*, 264 F.3d at 142; *CINAR*, 186 F.Supp.2d at 316.

■■■ Shalek maintains that the plaintiffs have failed to allege a strong inference of fraudulent intent because her motive could not have been personal financial gain, as the plaintiffs allege. To the contrary, the Court finds that the Second Amended Complaint contains facts sufficient to show Shalek's motive for concealing her agreements with Sterling Foster was personal and to obtain concrete financial gain, which is sufficient to support an allegation of a strong inference of fraudulent intent. *See Novak*, 216 F.3d at 307, 310. The Second Amended Complaint alleges that prior to the Advanced Voice IPO, Shalek and her husband each owned 250,000 shares of Advanced Voice; prior to

the Com/Tech IPO, Shalek owned 250,000 shares of Com/Tech; and prior to the ML Direct IPO, Shalek owned 553,000 shares of ML Direct. The Second Amended Complaint also states that Shalek obtained the shares for, at most, $1.00 per share. If Shalek and Sterling Foster had not entered into the secret agreements by which Sterling Foster would release Shalek from her lock-up agreement and purchase her shares, or in the case of ML Direct, only purchase her shares, Shalek would have had to hold the shares for at least one year with no guarantee of ever being able to sell them for a profit.

However, because of her secret agreements with Sterling Foster, Shalek was able to unload all of her shares for anywhere between $1.50 to $3.00 per share. Even assuming the narrowest profit margin, i.e., that Shalek purchased the shares at $1.00 per share and sold them at $1.50 per share, Shalek would have pocketed the sum of $656,500. Based on the foregoing, the Court finds that the Second Amended Complaint asserts that Shalek's motive to commit fraud was personal and to obtain concrete financial gain and that it contains sufficient factual allegations to support this assertion. See Novak, 216 F.3d at 311 (stating that allegations that the defendants benefitted in a personal and concrete way from the fraud can give rise to a strong inference of fraudulent intent if the facts are sufficiently pled).

Shalek's motive and opportunity to commit fraud are even more apparent when her alleged role in the scheme is viewed in conjunction with that of Sterling Foster. According to the Second Amended Complaint, Shalek and Sterling Foster were dependent upon each other, and both profited greatly in their alleged scheme. Sterling Foster could not have artificially inflated the price of Advanced Voice, Com/Tech, and ML Direct and sold short to such a large extent if they were not certain

that they had a source of stock in Shalek. Further, Shalek could not have sold her shares without the permission of the underwriters. When Shalek did sell to Sterling Foster, she did so at one and one-half to three times the purchase price of the shares. While that price enabled Shalek to realize a huge profit, it also enabled Sterling Foster to obtain the shares it needed to cover its short at a deep discount to the prevailing price. Thus, when Sterling Foster used the shares it had purchased from Shalek to cover its short, it too realized an enormous profit before the markets in the various securities plummeted.

The Court finds that these allegations demonstrate Shalek's awareness that the prospectus omitted material information regarding the lock-up agreements. Sterling Foster would not have assumed its enormous short positions if it had been uncertain about obtaining the shares from Shalek to cover its short. Therefore, assuming the allegations in the complaint are true, Sterling Foster would have arranged the release and purchase of Shalek's shares before the terms of the offering were even finalized. As the other party to the secret agreement, Shalek would also have been aware of its terms. The allegations concerning Shalek's role in the scheme show that she knew the prospectus omitted material facts. Accordingly, the Court finds that the complaint sufficiently alleges a strong inference of Shalek's fraudulent intent. Novak, 216 F.3d at 307, 310.

The Court finds Shalek's three arguments in support of her claim to the contrary to be without merit. Where, as here, the complaint contains information from which one can approximately calculate the minimum amount of financial gain of a defendant, the Court finds that the complaint need not contain the exact sums for

financial gain to serve as the defendant's motive to commit fraud. In addition, the assertion that given the market price of the securities and Sterling Foster's need for them, Shalek could have demanded a higher price for her shares of the various companies overlooks the fact that the fraudulent omissions were part of a secret agreement, the terms of which had been pre-negotiated and fixed and from which both parties reaped huge financial gains. Furthermore, the Court finds that the statement in the prospectuses that the lock-up agreements were subject to early termination does not detract from the complaint's showing of Shalek's motive. The complaint alleges that Shalek concealed her agreement with Sterling Foster by which the underwriter would, without doubt, release Shalek from her lock-up agreements and purchase her shares in order to cover its massive short position at a price that was a substantial discount to the prevailing market price but that enabled Shalek to realize large profits.

Com/Tech, ML Direct, and Lasergate also maintain that the complaint does not contain factual allegations sufficient to support a strong inference of these three companies' fraudulent intent. In particular, Com/Tech and ML Direct assert that they would have received the financing from the offerings in the absence of any fraud because the offerings were firm commitments, and thus, the amount of money they received was unrelated to the price or number of shares in the aftermarket. Lasergate contends that the allegations of scienter are conclusory and constitute improper group leading.

The Court finds these arguments unpersuasive. Like Shalek, the Issuer Defendants' motive to commit fraud was personal and concrete financial gain. The plaintiffs alleged that the Issuer Defendants' financial gain came in the form of the financing they received as a result of

the IPOs that were based on prospectuses with material omissions and that provided an opportunity for market manipulation. Because the plaintiffs have alleged that the Issuer Defendants benefitted in a concrete and personal way from the purported fraud, the Court finds that the plaintiffs have pled facts sufficient to support a strong inference of scienter on the part of Com/Tech, ML Direct, and Lasergate. *See Novak,* 216 F.3d at 311; *In re CINAR,* 186 F.Supp.2d at 315; *Cyber Media,* 183 F.Supp.2d at 574.

The argument by Com/Tech and ML Direct that the complaint does not allege motive because the companies would have received the financing in the absence of the fraud asks the Court to weight the evidence that might be presented at trial and consider who might ultimately prevail. However, the Court's present function is merely to determine whether the complaint itself is legally sufficient. The Court also finds unpersuasive Lasergate's assertions, that the allegations of scienter are conclusory and constitute impermissible group pleading. Lasergate's argument is based on one quotation from the complaint, which it reads in a vacuum. In addition, the argument does not detract from the Court's finding that the plaintiffs alleged that Lasergate received a concrete and personal financial gain from the fraudulent IPOs. Accordingly, the Court cannot conclude, as a matter of law, that the complaint fails to allege motive by the Issuer Defendants to commit fraud.

 On the other hand, the Court finds that the plaintiffs have failed to allege a strong inference of fraudulent intent against Harriton. First, the plaintiffs do not allege that Harriton had a motive to commit fraud. Although the complaint alleges that Bear Stearns obtained financial gains as a result of its relationship with Sterling Foster, the complaint does not

allege that Harriton benefitted in a concrete and personal way from the material omissions or the fraudulent scheme. Nor does the complaint identify circumstances indicating conscious misbehavior or recklessness by Harriton. Indeed, there is nothing to suggest that Harriton's conduct was "highly unreasonable" or that it constituted an "extreme departure from the standards of ordinary care." *Novak*, 216 F.3d at 308. Moreover, to the extent that the plaintiffs allege that Bear Stearns egregiously refused to see the obvious, or to investigate the doubtful, *see Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996), they do not make that allegation in regard to Harriton personally.

In fact, other than listing Harriton as a defendant in regard to particular claims, the plaintiffs only mention him six times in the 110–page complaint. The complaint alleges that Harriton (1) was the Senior Managing Director of BSSC (complaint ¶ 33(a)); (2) became friends with Pace in the late 1980's (complaint ¶ 33(b)); (3) was the father of Matthew Harriton who served as CFO of Embryo since 1996 and President, CEO, and a director of Embryo since 1997 (complaint ¶ 33(c)); (4) was the head of BSSC's clearing operations (complaint ¶ 76); (5) had relationships with the principals of boiler room operations (complaint ¶ 76); and (6) according to a *Business Week* article entitled, "Did Bear Stearns Ignore a Stock Swindle?", was being investigated by the SEC and the Manhattan District Attorney's Office concerning knowledge he may have had regarding Sterling Foster's fraudulent conduct (complaint ¶ 77(a)).

These allegations do not suggest a strong inference of fraudulent intent on the part of Harriton. The Court finds that these allegations fail to satisfy even the more lenient standard for pleading scienter under Rule 9(b). *See* Fed.R.Civ.P. 9(b) ("conditions of the mind may be averred

generally"). Accordingly, the Court grants Harriton's motion to dismiss the claims brought against him pursuant to Section 10(b) and Rule 10b–5, and those claims are dismissed as against Harriton.

### b. Loss Causation and Reliance

The Sterling Foster Defendants, the Shalek Defendants, Pace and Novich, and Lasergate all argue for the dismissal of the Section 10(b) and Rule 10b–5 claims on the ground that the plaintiffs have failed to plead loss causation. In particular, these defendants claim that the release of the Selling Securityholders' shares could not have caused the plaintiffs' loss because the price of the various stocks continued to rise following the release of those shares. The defendants further assert that the publication of *The Wall Street Journal* article on October 9, 1996 was the cause of the plaintiffs' loss because the price of their shares fell following the publication of the article. In addition, Lasergate contends that the plaintiffs have failed to plead loss causation with the particularity required by Rule 9(b) and the PSLRA.

Although none of the defendants attacks the sufficiency of the pleadings in regard to "transaction causation," the Sterling Foster Defendants, Pace, and Novich allege that the plaintiffs have failed to plead reliance. According to these defendants, the complaint lacks any specific allegation that the plaintiffs relied on the defendants' alleged misrepresentations or material omissions. The defendants also argue that the plaintiffs cannot establish reliance based on a fraud-on-the-market theory because they purchased their securities in an initial public offering.

 It is well settled that causation under federal securities laws is a two-pronged inquiry: transaction causation and loss causation. *See Suez Equity Investors, L.P. v. Toronto–Dominion Bank*,

250 F.3d 87, 95 (2d Cir.2001); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir.2000). Transaction causation is a term that is used interchangeably with the word reliance. *AUSA Life Ins.*, 206 F.3d at 209; *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992) (stating that the reliance element of a Section 10(b) claim is referred to as "transaction causation"); *Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 967 F.2d 742, 747 (1992). A plaintiff can sufficiently allege the existence of transaction causation when he shows that the violation in question caused him to enter into the transaction at issue. *AUSA Life Ins.*, 206 F.3d at 209. On the other hand, "[l]oss causation is causation in the traditional 'proximate cause' sense— the allegedly unlawful conduct caused the economic harm." *AUSA Life Ins.*, 206 F.3d at 209, 211–12. Thus, to satisfy both causation prongs, the plaintiff must demonstrate that the fraud caused him "to engage in the transaction and that it caused the harm actually suffered." *Suez Equity Investors*, 250 F.3d at 96. Indeed, the PSLRA requires the plaintiff to demonstrate that the act complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

■ In order to sufficiently allege transaction causation, or reliance, the plaintiff must allege that the violations under consideration caused him to engage in the transaction. *See Litton Indus.*, 967 F.2d at 747. In cases where the allegations of fraud are based on a defendant's affirmative false statement, the plaintiff can satisfy the transaction prong of causation by showing that he relied on the misrepresentation when he entered into the transaction that caused the economic loss. *See Burke*, 981 F.2d at 1378. However, in connection with a claim of material omission, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material

in the sense that a reasonable investor might have considered them important in the making of his decision." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *see Burke*, 981 F.2d at 1379. Thus, where the plaintiff's claim is based on a defendant's failure to disclose material information, transaction causation, or reliance, may be presumed. *Litton Indus.*, 967 F.2d at 747–48.

The Court finds that the complaint at hand adequately alleges transaction causation. First, the majority of the complaint focuses on the defendants' failure to disclose to the plaintiffs the secret agreements between Sterling Foster and the Selling Securityholders whereby Sterling Foster would release the Selling Securityholders from their lock-up agreements and purchase all of their shares at a substantial discount to the prevailing market price in order to cover a huge short position. As discussed in detail above, the Court finds these omissions to be material. Accordingly the plaintiffs do not have to allege reliance to survive a motion to dismiss the complaint. *See Affiliated Ute Citizens*, 406 U.S. at 153–54, 92 S.Ct. at 1472; *Burke*, 981 F.2d at 1378–79; *Litton Indus.*, 967 F.2d at 747–48. Because the complaint is based on the defendants' failure to disclose material facts, reliance is presumed. *See Affiliated Ute Citizens*, 406 U.S. at 153–54, 92 S.Ct. at 1472; *Burke*, 981 F.2d at 1378–79; *Litton Indus.*, 967 F.2d at 747–48.

Moreover, the Court notes that the Sterling Foster Defendants, Pace, and Novich disregard the plaintiffs' boiler-room allegations in claiming that they have failed to plead reliance. Indeed, the plaintiffs allege that registered representatives of Sterling Foster, including defendants Hawley and Paulson, cold called potential investors and made various misrepresenta-

tions, including telling the customers that the stocks were oversubscribed; institutions were poised to purchase large blocks of the securities; and the stocks would reach their respective target prices within a matter of days. Drawing all reasonable inferences in favor of the plaintiffs, the Court finds that the complaint adequately alleges that the plaintiffs relied on the defendants' misrepresentations when they purchased the securities, and were it not for the high-pressure, deceptive sales practices of the defendants, the plaintiffs likely would not have purchased stock in the six Issuer Defendants. Thus, to the extent that the Sterling Foster Defendants, Pace, and Novich move to dismiss the Section 10(b) claims on the ground that the plaintiffs failed to plead reliance, that motion is denied.

The Second Circuit has set forth "somewhat inconsistent precedents on loss causation," *Suez Equity Investors*, 250 F.3d at 98 n. 1 (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–70 (2d Cir.1994)); *Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (per curiam); *Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 22 (2d Cir.1986). However, the Court of Appeals intends to hold defendants liable only for the reasonably "foreseeable consequences of their actions." *Suez Equity Investors*, 250 F.3d at 98. Indeed, the Second Circuit recently held that loss causation embodies notions of the common law tort concept of proximate causation and foreseeability. *See Suez Equity Investors*, 250 F.3d at 98; *AUSA Life Ins.*, 206 F.3d at 216 (quoting *Mfrs. Hanover Trust Co.*, 801 F.2d at 20); *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992). Thus, loss causation " 'in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation.' " *AUSA Life Ins.*, 206 F.3d at 211–12 (quoting *Mfrs. Hanover Trust Co.*, 801 F.2d at 20).

The foreseeability question is not " 'whether the defrauded party might conceivably still have lost, had the fraud not been practiced, but whether there was a reasonable probability that the fraud actually accomplished the result it was intended to bring about.' " *AUSA Life Ins.*, 206 F.3d at 212 (quoting *Continental Ins. Co. v. Mercadante*, 222 A.D. 181, 186–87, 225 N.Y.S. 488, 493–94 (1st Dept.1927)). A finding of foreseeability turns on fairness, policy considerations, and "a rough sense of justice." *AUSA Life Ins.*, 206 F.3d at 217–18 (quoting *Palsgraf v. L.I.R.R. Co.*, 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928)); *Suez Equity Investors*, 250 F.3d at 96 ("In the end, whether loss causation has been demonstrated presents a public policy question, the resolution of which is predicated upon notions of equity because it establishes who, if anyone, along the causal chain should be liable for the plaintiffs' losses.").

In regard to the policy aspect of foreseeability, there are three general purposes underlying the PSLRA: "(1) to encourage the voluntary disclosure of information by corporate issuers; (2) to empower investors so that they—and not their lawyers—exercise control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid claims for securities fraud and to encourage defendants to fight abusive claims." *AUSA Life Ins.*, 206 F.3d at 219 (quoting S.Rep.No. 104–98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683). In determining whether the plaintiffs have sufficiently alleged loss causation, the Court is mindful that determinations of proximate cause and foreseeability are generally reserved for the finder of fact, *AUSA Life Ins.*, 206 F.3d at 217, and that the Court is presently considering only whether the complaint itself is legally sufficient *see Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995).

Applying these standards to the facts of this case, the Court finds that the Second Amended Complaint adequately alleges loss causation. Assuming that all the allegations in the complaint are true, *Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999); *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998), the Court finds that the defendants could reasonably have foreseen that when the terms of the secret agreements were fulfilled, the value of the securities held by the plaintiffs would fall. Indeed, the law of supply and demand dictates that when the number of units available for sale more than doubles, but the demand for those units remains stable, the value of the units declines. Applying this basic economic principle to the facts of this case, when Sterling Foster purchased the Selling Securityholders' shares at discounted prices and covered their short positions with those shares, it was reasonably foreseeable that the value of the shares would plummet because the market for each of the securities would be flooded with more than double the number of shares in the offering. Further, the defendants could reasonably have foreseen that the precipitous drop in the value of the securities would create an economic loss for the plaintiffs, in particular, because the complaint alleges that the defendants had induced the plaintiffs to purchase the shares at prices that they had artificially inflated through the use of boiler-room selling tactics and massive short sales.

Policy considerations and a "rough sense of justice" weigh in favor of finding that loss causation has been adequately alleged. As to the first purpose of the PSLRA, the Second Amended Complaint alleges that the Sterling Foster Defendants, the Shalek Defendants, Pace, Novich, the Selling Securityholders, and the Issuer Defendants concealed the secret agreements between Sterling Foster and the Selling Securityholders from which all of those defendants would derive a financial benefit. A finding that loss causation has been alleged in the Second Amended Complaint may deter similar future concealment. In addition, although abusive and meritless shareholder suits occur, the Court is of the opinion that finding adequate allegations of loss causation in this case "will not open the barn door for such." *AUSA Life Ins.*, 206 F.3d at 219. Moreover, where as here, the economic losses suffered by the plaintiffs were allegedly the product of a full-scale scheme of market manipulation, lies, and material omissions, that, assuming the allegations are true, had to have been well-organized far in advance of its execution, a rough sense of justice as well as present political and economic concerns support finding that the plaintiffs have adequately alleged loss causation. *See Suez Equity Investors,* 250 F.3d at 96; *AUSA Life Ins.,* 206 F.3d at 217–18.

Contrary to the arguments put forth by the defendants, the plaintiffs' allegation that the prices of Advanced Voice, Com/Tech, and ML Direct dropped following the publication of *The Wall Street Journal* article does not foreclose the possibility that the their loss was due to the defendants' conduct. First, the defendants do not argue that the plaintiffs' have failed to allege that they suffered an economic loss prior to the publication of the article in *The Wall Street Journal.* Indeed, some plaintiffs allege that they purchased their shares at prices that are much higher than the prices at which those stocks closed on October 9, 1996. Second, a news article describing the defendants' allegedly fraudulent conduct is a reasonably foreseeable consequence of that conduct, and a decline in the price of a stock is a reasonably foreseeable consequence of the publication of bad news.

Accordingly, the Court finds that although the article in *The Wall Street Jour-*

*nal* may be an intervening event in the chain of causation, for the purposes of this decision, it is not a superceding event that breaks the causal chain and defeats the allegation of proximate causation. *See Mason v. U.E.S.S. Leasing Corp.*, 96 N.Y.2d 875, 730 N.Y.S.2d 770, 756 N.E.2d 58, 59 (2001) (holding that for an event to be superceding and to break the chain of causation, it must be unforeseeable). Third, the defendants' argument goes to the merits of whether the plaintiffs' have established loss causation, not to whether it is adequately alleged. As mentioned at several points throughout this decision, the Court's present function is not to weigh the evidence that might be presented at trial but to determine whether the plaintiffs are entitled to offer evidence to support the claims. *See Villager Pond*, 56 F.3d at 378. Because the Second Amended Complaint alleges a reasonable probability that the fraud actually accomplished the result it was intended to bring about, *AUSA Life Ins.*, 206 F.3d at 212, the Court finds that the Second Amended Complaint adequately alleges loss causation. As such, the motions by the defendants to dismiss the complaint on the ground that it fails to allege causation are denied.

### 5. Pleading Fraud With Particularity

The Sterling Foster Defendants, the Shalek Defendants, Pace and Novich, Lasergate, the Bear Stearns Defendants and Harriton all argue that the Section 10(b) and common law fraud claims are not pled with the specificity required by Rule 9(b) and the PSLRA. The Shalek Defendants and Lasergate argue that the complaint does not contain sufficient detail regarding the secret agreements. The Shalek Defendants, Lasergate, Pace, and Novich assert that the allegations of fraud do not specify the role of each defendant. The Bear Stearns Defendants and Harriton

claim that the complaint fails to identify specific statements or omissions made by them. The Sterling Foster Defendants merely raise a conclusory assertion that the allegations of fraud are not pled with sufficient particularity.

As noted above, a complaint asserting securities fraud generally must satisfy the heightened pleading standard of Rule 9(b) of the Fed.R.Civ.P., which requires that "[i]n all averments of fraud ..., the circumstances constituting the fraud shall be stated with particularity." The purpose of Rule 9(b) is threefold: (1) to provide the defendant with fair notice of the claims against him; (2) to protect the defendant from harm to his reputation or goodwill; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir.1987). Applying this standard to complaints alleging securities fraud based on a material misrepresentation or omission, the Second Circuit has held that the plaintiffs must: " '(1) specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). In addition, the PSLRA requires that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b).

■ Further, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio*, 822 F.2d at 1247. However, the Second Circuit has recognized an exception to this

rule prohibiting group pleadings of fraud. *See id.* Where the defendants are insiders or affiliates in the offer of the securities in question and the misrepresentations or material omissions are conveyed in offering documents, it is reasonable to presume that the fraudulent conduct is the collective action of the officers and insiders. *See id.; Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *In re Health Management, Inc. Sec. Litig.,* 970 F.Supp. 192, 208 (E.D.N.Y.1997) (quoting *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987)).

In addition, in securities fraud cases involving facts that are "peculiarly within the knowledge of defendants," courts have "relaxed" the application of Rule 9(b) to allow more generalized pleading provided that the allegations are "accompanied by a statement of the facts upon which the belief is based." *DiVittorio,* 822 F.2d at 1247. Where the fraudulent scheme alleged is one of market manipulation, "the exact mechanism of the scheme is likely to be unknown to the plaintiffs." *In re Blech Sec. Litig.,* 961 F.Supp. 569, 580 (S.D.N.Y. 1997) (*Blech II*). In such cases, Courts have found allegations of fraud to have been pled with sufficient particularity when the complaint specifies: (1) the manipulative acts performed; (2) which defendants performed them; and (3) the effect the scheme had on the market for the securities at issue. *See Vandenberg v. Adler,* No. 98 Civ. 3544 WHP, 2000 WL 342718 *5 (S.D.N.Y. March 31, 2000) (citing *Blech II,* 961 F.Supp. at 580).

■ Applying these standards to the allegations in the Second Amended Complaint, the Court finds that with the exception of the claims against the Bear Stearns Defendants and Harriton, the complaint's allegations of fraud are pled with sufficient particularity. Unlike most claims of fraud, which are based on affirmative misrepresentations and, thus, the details of the defendants' conduct are within the plaintiff's knowledge, the claims of fraud in this complaint are centered on allegations of material omissions and market manipulation. Accordingly, the specific facts underlying the plaintiffs' claims of fraud are likely unknown the plaintiffs and, more likely, are peculiarly within the knowledge of the defendants. *See DiVittorio,* 822 F.2d at 1247; *Vandenberg,* 2000 WL 342718 *5; *Blech II,* 961 F.Supp. at 580. Therefore, in this case, a more generalized allegation of fraud than that required by Rule 9(b) is permissible. *See DiVittorio,* 822 F.2d at 1247; *Vandenberg,* 2000 WL 342718 *5; *Blech II,* 961 F.Supp. at 580.

Nevertheless, the allegations of material omissions are pled with nearly the particularity required by Rule 9(b). The Second Amended Complaint states that each prospectus should have disclosed the secret agreements between the various Selling Securityholders and Sterling Foster, by which Sterling Foster agreed to release the Selling Securityholders from their lock-up agreements and purchase their shares at a substantially discounted price in order to cover a huge short position they intended to establish. Had they been aware of the secret agreements, the plaintiffs would have known that an additional amount of shares, numbering anywhere from one-third-to-three-times the amount of shares in the offering, would be released into the aftermarket shortly following the offering. The Second Amended Complaint also alleges where and when this information should have been disclosed: in the prospectuses and on their effective dates, which are listed in the complaint. Thus, the allegations regarding the material omissions fulfill three of the four requirements for pleading an affirmative misrepresentation claim with particularity. *See Shields,* 25 F.3d at 1128 (claim of fraud based on an affirmative misrepresentation must "(1) specify the statements that the

plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent").

Where, as here, the allegation is one of material omission, the plaintiffs cannot be expected to know the identity of the person who should have made the statement. *See DiVittorio*, 822 F.2d at 1247; *Vandenberg*, 2000 WL 342718 *5; *Blech II*, 961 F.Supp. at 580. Accordingly, the Court finds the absence of this allegation from the complaint does not defeat the claims of fraud. Nor is the Court persuaded that, as Lasergate and the Shalek Defendants allege, the complaint should contain more details regarding the secret agreements. The Shalek Defendants seek proof of the agreements' existence in the complaint (*see* Shalek Defendants Memorandum of Law, pp. 13–14). However, "a complainant is not required to plead evidence." *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974). In addition, facts such as (1) whether the agreements were oral or written; (2) the identities of the parties to the agreements; and (3) the Lasergate representative who had knowledge of the agreements, are "within the exclusive provenance of the defendants." *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972). Accordingly, the Court finds that where, as here, the claims of fraud are based on material omissions and there has been no discovery, Rule 9(b) cannot be read to require the level of specific detail demanded by the Shalek Defendants and Lasergate.

The Court also finds that the Second Amended Complaint contains sufficient detail regarding the claims of market manipulation. The Court notes that, as mentioned above, where as here, the claims of fraud are based on allegations of market manipulation, many of the scheme's specifics are within the peculiar knowledge of the defendants, and the application of Rule

9(b) is somewhat "relaxed." *DiVittorio*, 822 F.2d at 1247–48; *Vandenberg*, 2000 WL 342718 *5; *Blech II*, 961 F.Supp. at 580. The plaintiffs assert that prior to each offering, Selling Securityholders, including Pace, Shalek, and Krasnoff's company, purchased a substantial amount of stock in each of the Issuer Defendants for approximately $1.00 per share. As noted, all but one of these blocks of securities were subject to lock-up agreements. However, the Selling Securityholders made secret arrangements with Sterling Foster to break the lock-up agreements and sell their shares to Sterling Foster at substantial discounts while reaping profits for themselves. Meanwhile, registered representatives of Sterling Foster, including Hawley, Paulson, and Lieberman, employed high-pressure, boiler-room sales tactics to artificially inflate the price of the six securities in the aftermarket. Thus, in many cases, the plaintiffs purchased their shares at more than double the offering price of the securities. Sterling Foster's sales force also sold anywhere from one-and-one-half-to-three times the amount of stock it owned to retail customers such as the plaintiffs thereby establishing huge short positions.

Further, pursuant to the secret agreements, Sterling Foster released the shares from the lock-ups and purchased them at below-market prices ranging from $1.50 to $3.00. Therefore, allege the plaintiffs, the Selling Securityholders profited, and Sterling Foster covered its short positions with extremely cheap shares thus enabling it to realize massive profits. The Second Amended Complaint further alleges that after Sterling Foster covered its short position, its sales force stopped using their boiler-room sales practices and covered their short positions, and the stock prices plummeted. This Court finds these allegations are sufficiently specific to establish claims of fraud based on market ma-

nipulation, because they identify: (1) the manipulative acts performed; (2) which defendants performed them; and (3) the effect the scheme had on the market for the securities at issue. *See Vandenberg,* 2000 WL 342718 *5; *Blech II,* 961 F.Supp. at 580.

The Court disagrees with the claims by the Shalek Defendants, Lasergate, Pace, and Novich that the Second Amended Complaint fails to plead the roles of each defendant with sufficient particularity. In regard to the claims of fraud based on market manipulation, the preceding paragraph demonstrates that the plaintiffs described the specific roles of the defendants in the manipulative scheme. To the extent that the details demanded by the defendants are missing, the Court finds that those details are likely "within the exclusive provenance of the defendants." *Segal,* 467 F.2d at 608.

Moreover, the allegations of market manipulation in this case are sufficient to provide the defendants with notice of the claims against them. *See DiVittorio,* 822 F.2d at 1248 (holding that providing defendants with notice of the claims against them is one of the purposes of Rule 9(b)). In regard to the claims of fraud based on material misstatements or omissions, the Court presumes that the material omissions are the collective actions of the officers and insiders of each defendant company because they are alleged to have been omitted from offering documents. *See DiVittorio,* 822 F.2d at 1247; *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *In re Health Management, Inc. Sec. Litig.,* 970 F.Supp. 192, 208 (E.D.N.Y.1997). Accordingly, with the exception of the Bear Stearns Defendants and Harriton, the Court declines to dismiss the claims of fraud on the ground of impermissible group pleading.

Even applying a pleading standard that is more relaxed than that re-quired by Rule 9(b), the Court finds that the plaintiffs' allegations of fraud against the Bear Stearns Defendants and Harriton are not sufficiently particular under either the market manipulation or the material omission theory. The plaintiffs contend that the Bear Stearns Defendants and Harriton (1) knew that the prospectuses omitted mention of the secret agreements; and (2) cleared Sterling Foster's trades. However, the complaint does not contain any factual allegations to support these conclusory claims and does not explain how this knowledge or conduct is fraudulent. Such a claim is not sufficient to provide these defendants with fair notice of the claims against them. *See DiVittorio,* 822 F.2d at 1247. Thus, even applying a more lenient Rule 9(b) pleading standard on the ground that the allegations pertain to information within the peculiar knowledge of the defendants, the Court finds that the mere allegations that the Bear Stearns Defendants and Harriton made material omissions, without more, does not satisfy the pleading requirements of Rule 9(b) or the PSLRA.

To hold otherwise would do little to prevent clearing brokers from becoming defendants in every securities fraud lawsuit. *See AUSA Life Ins. v. Ernst & Young,* 206 F.3d 202, 219 (2d Cir.2000) (stating that one of the three purposes of the PSLRA is to encourage defendants to fight abusive claims); *DiVittorio,* 822 F.2d at 1247 (holding that the purposes of the heightened pleading standards of Rule 9(b) include protecting the reputation and goodwill of defendants and preventing strike suits). Accordingly, the Court grants the motions by the Bear Stearns Defendants and Harriton to dismiss the claims of fraud for failure to plead with sufficient particularity, and claim 31 is dismissed as against those defendants.

### 6. Control Person Liability

Pace and Shalek move to dismiss the plaintiffs' claims alleging control person liability under Section 15 of the Securities Act and Section 20 of the Exchange Act. Pace argues that the complaint does not contain particularized facts as to his culpable participation in management's alleged fraud. Shalek bases her motion on the assertion that the plaintiffs have failed to allege a primary violation and, thus, there can be no secondary liability.

Section 15 of the Securities Act, 15 U.S.C. § 77o, provides that "any person who ... controls" any entity that violates the Securities Act "shall be liable jointly and severally" for those violations, unless the control person lacked knowledge of the events giving rise to the liability. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that a person in control of an entity that violates the Exchange Act is jointly liable for such violations "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

■■■ In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir.1998); *see Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey Secs.*, 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2).

■■■ Examination of control person liability under the Securities Act is governed by the same analysis as that used for control person liability under the Exchange Act. *See In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 208 (E.D.N.Y. 2000). However, this Court has joined several other district courts in the Second Circuit in holding that the concept of culpability, the third requirement of a Section 20(a) violation, does not apply to a Section 15 violation because Sections 11 and 12 sound in strict liability and do not require knowledge by the defendants of the misrepresentations. *In re Twinlab*, 103 F.Supp.2d at 208; *see In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 310 (E.D.N.Y.2002); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 753–54 (S.D.N.Y.2001). Thus, to plead control person liability under the Securities Act, it is sufficient merely to show that the individual defendants controlled an entity that violated the securities laws. *In re Twinlab*, 103 F.Supp.2d at 209.

To the extent that the Shalek defendants have moved to dismiss the claims brought pursuant to Sections 11 and 10(b) on the ground that the plaintiffs have failed to state a claim upon which relief can be granted, the Court has denied their motion. Accordingly, the Court denies the motion by Shalek to dismiss the Section 15 and Section 20(a) claims on the ground that the Second Amended Complaint fails to plead primary violations.

Pace's assertion, that the claims of control person liability should be dismissed because the plaintiffs fail to allege his culpable participation in the fraud, constitutes a challenge only to the Section 20(a) claims. As noted above, the concept of culpability is inapplicable to Section 15

claims. Thus, to the extent that Pace moves to dismiss the claims brought pursuant to Section 15, that request is denied. *See In re CINAR Corp.*, 186 F.Supp.2d at 310; *In re Indep. Energy Holdings*, 154 F.Supp.2d at 753–54; *In re Twinlab*, 103 F.Supp.2d at 208.

 Further, the Court finds that the allegations regarding Pace's participation in the alleged fraud are sufficient to withstand a motion to dismiss the Second Amended Complaint. The plaintiffs allege that Pace exercised secret control over Sterling Foster; provided Lieberman with capital for Sterling Foster's operations; supervised Sterling Foster's business activities, including setting Lieberman's salary; and secretly received a portion of Sterling Foster's profits (complaint ¶ 41). The Second Amended Complaint also asserts that Pace engaged in deceptive and manipulative sales practices in selling the Issuer Defendants' securities (complaint ¶ 69). The plaintiffs claim that Pace determined which offerings Sterling Foster would underwrite and dictated the number of shares to be registered, the offering price, and the lawyers and accountants selected to work on the underwritings (complaint ¶ 75). The plaintiffs also charge Pace, and others, with disseminating materially false and misleading prospectuses for Advanced Voice, Com/Tech, and Applewoods (complaint ¶¶ 82, 100, 123). In addition, the complaint alleges that Pace was a party to the secret agreements by which Sterling Foster would release and purchase the shares owned by the Selling Securityholders (complaint ¶¶ 96, 122, 131, 142).

The Court finds that these allegations, taken together, are sufficient to demonstrate that Pace was in some meaningful sense a culpable participant in the scheme. *See Suez Equity Investors*, 250 F.3d at 101. Accordingly, the plaintiffs have sufficiently pled control-person liability, and Pace's motion to dismiss the Section 20(a)

claims is denied. *Boguslavsky*, 159 F.3d at 721.

### 7. Supplemental Jurisdiction

 The IADs, Pace, and Lasergate argue that in the event the Court dismisses the federal causes of action, the Court should decline to exercise supplemental jurisdiction over the state-law claims. The Court has not dismissed all of the federal claims against Pace and Lasergate. Further, although the Court has dismissed all of the federal causes of action against the Individual Applewoods Defendants, the Court has not dismissed all of the federal causes of action. Because the state-law claims against the IADs, Pace, and Lasergate arise out of the identical set of factual allegations that form the basis of the plaintiffs' remaining federal claims, the Court will retain jurisdiction over the remaining state law claims in the interest of judicial economy. *See* 28 U.S.C. § 1367(a) (providing the court with "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (holding that a federal court has jurisdiction over an entire action, including the state-law claims when the federal-law and state-law claims "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding"). Accordingly, the requests by the IADs, Pace, and Lasergate are denied.

### 8. Negligent Misrepresentation

 "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a

duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir.2000); *see King v. Crossland Savs. Bank,* 111 F.3d 251, 257–58 (2d Cir.1997). The Sterling Foster Defendants, the Shalek Defendants, Lasergate, and Applewoods move to dismiss the negligent misrepresentation claims on the ground that the complaint does not allege a special relationship between the plaintiffs and these defendants.

▇▇▇ The New York Court of Appeals has held that the special duty giving rise to a negligent misrepresentation claim must arise out of "actual privity of contract between the parties or a relationship so close as to approach that of privity." *Parrott v. Coopers & Lybrand, LLP,* 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 711, 741 N.E.2d 506 (2000). The Court explained that the privity requirement " 'is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability.' " *Id.* To determine whether the special relationship exists in a commercial context such as the one presented by this case, a court generally weighs three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 264, 652 N.Y.S.2d 715, 719, 675 N.E.2d 450 (1996).

▇▇▇ Because the plaintiffs do not allege privity of contract with the defendants, the Court must weight the factors set forth in *Kimmell* to determine whether the allegations are sufficient to establish a relationship so close as to approach that of privity. *See Parrott,* 95 N.Y.2d at 483, 718 N.Y.S.2d at 711, 741 N.E.2d 506. The plaintiffs do not allege that they met or spoke with representatives from Applewoods, Lasergate, Com/Tech, ML Direct, or Shalek. In the absence of any allegations that the plaintiffs and these defendants had any contact, the Court cannot find that any relationship existed between the parties much less one of trust or confidence. Indeed, to hold otherwise would defeat the purpose of the special relationship requirement and expose virtually every company and its director to liability for negligent misrepresentations. *See id.* Accordingly, the Court finds that the plaintiffs have failed to state a claim for negligent misrepresentation with regard to Applewoods, Lasergate, Com/Tech, ML Direct, or Shalek.

Although the Court denied the request by the IADs to dismiss the negligent misrepresentation claim on jurisdictional grounds, the Court now finds that the plaintiffs have failed to state a claim for negligent misrepresentation against the IADs. Again, the plaintiffs do not allege that they had any personal contact with any of the IADs. In light of the fact that the Second Amended Complaint does not refer to a single conversation between the IADs and the plaintiffs, the Court cannot find that a relationship so close as to approach that of privity existed between them. *See id.* Accordingly, the Court dismisses the claim of negligent misrepresentation against the IADs. *See Hydro Investors,* 227 F.3d at 20.

▇▇▇ On the other hand, the Court finds that the complaint alleges sufficient

facts from which the Court can infer a special relationship between the plaintiffs and the Sterling Foster Defendants. Indeed, the Second Amended Complaint "implies a relationship between the parties that extended beyond the typical arm's length business transaction." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir.2001). Hawley, Paulson, and the other members of the Broker Class initiated contact with the plaintiffs by cold-calling them and induced the plaintiffs to purchase shares of the Issuer Defendants by telling them that the stock was oversubscribed due to great buying interest; institutional investors were ready to purchase large blocks of the stock; and the stock would reach its target price in a matter of days (complaint ¶ 68).

Given that Lieberman, as the president of Sterling Foster, is alleged to have sold Advanced Voice units to 35 customers (complaint ¶ 90), the Court finds that it is reasonable to infer that he used statements and tactics similar to those used by his employees when he sold the securities. Hawley, Paulson, and the other members of the Broker Class also dissuaded customers from selling their shares by falsely stating that the share price would decline if they sold (complaint ¶ 158). In making these representations to the plaintiffs, the members of the Broker Class are alleged to have used high-pressure or "boiler-room" sales tactics. The Court finds that these statements are assurances meant to induce the plaintiffs into purchasing stock, despite the fact that they knew nothing about the companies. The representations are not " 'casual statements and contacts' that a seller would make informally in the course of a day's business, [but rather] 'deliberate representation[s]' that give rise to a duty to speak with care." *Suez Equity Investors*, 250 F.3d at 103 (quoting *Kimmell*, 89 N.Y.2d at 263, 652 N.Y.S.2d 715, 675 N.E.2d 450). As such, the Court finds that the plaintiffs have alleged the

second *Kimmell* factor. *See Kimmell*, 89 N.Y.2d at 264, 652 N.Y.S.2d at 719, 675 N.E.2d 450.

The plaintiffs have also pled the remaining two *Kimmell* factors with sufficient particularity. First, upon hearing statements such as "the stock will reach its target price in a matter of days," "the stock is oversubscribed," and "institutional investors are about to purchase large blocks of this stock," a reasonable investor would conclude that the speaker possessed special or unique knowledge about the stock. *See Kimmell*, 89 N.Y.2d at 264, 652 N.Y.S.2d at 719, 675 N.E.2d 450. At the very least, the Sterling Foster Defendants who made these statements appeared to have an understanding about the stocks that a layperson would not have. Second, the Second Amended Complaint implies that the Sterling Foster Defendants knew that the plaintiffs would rely upon their representations in deciding whether to purchase the securities and offered the information for this very purpose. *See Kimmell*, 89 N.Y.2d at 264, 652 N.Y.S.2d at 719, 675 N.E.2d 450. Thus, after weighing the three *Kimmell* factors against the factual allegations regarding the Sterling Foster Defendants, the Court finds that the Second Amended Complaint alleges the existence of a special relationship sufficiently to withstand a motion to dismiss.

In sum, the Court grants the motions by Applewoods, Lasergate, ML Direct, Com/Tech, Shalek, and the IADs, to dismiss the negligent misrepresentation claims but denies the same motion by the Sterling Foster Defendants.

### 9. The Section 349 Claims

 The following defendants move to dismiss the claims brought pursuant to Section 349 of the N.Y. Gen. Bus. L. on the ground that the section does not apply to investment transactions involving publicly

traded securities: the Sterling Foster Defendants, the Shalek Defendants, Pace and Novich, the Bear Stearns Defendants, Harriton, Applewoods, and Lasergate.

Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in [the] state." N.Y. Gen. Bus. L. § 349(a). The statute is a consumer protection device, *see Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995), that requires a finding of conduct that is "consumer oriented," *see S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996). Thus, a plaintiff must show that "the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741 (1995).

"Securities transactions are not explicitly exempted from Section 349, and the terms 'consumer' and 'consumer-oriented' are not defined by the statute." *Spirit Partners, L.P. v. audiohighway.com*, 99 Civ. 9020 (RJW), 2000 WL 685022 *7 (May 25, 2000). Further, neither the Second Circuit nor the New York Court of Appeals has addressed the issue of whether securities transactions fall within the protections of Section 349. Nevertheless, the courts within this Circuit that have been presented with the issue have held that Section 349 does not apply to securities transactions. *See Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F.Supp.2d 559, 581 (E.D.N.Y.2002) (relying on the decisions of other district courts within the Second Circuit to dismiss plaintiffs' Section 349 claims on the ground that they were based on securities fraud); *Spirit Partners*, 2000 WL 685022 *7 (finding that the court was bound by the decisions of the Appellate Division which held that Section 349 did not provide plaintiffs with a claim arising out of an alleged secu-

rities fraud); *Shahzad v. H.J. Meyers & Co., Inc.*, No. 95 Civ. 6196 (DAB), 1997 WL 47817 *12–13 (S.D.N.Y. Feb.6, 1997) (finding that because the allegations of securities fraud did not apply to the consumer public at large, the conduct forming the basis of the allegations was not prohibited); *Redtail Leasing, Inc. v. Bellezza*, 95 Civ. 5191, 1997 WL 603496 *6 (S.D.N.Y. Sept.30, 1997) (holding that Section 349 should not be applied to investment transactions in securities); *In re Motel 6 Sec. Litig.*, Nos. 93 Civ. 2183 (JFK), 1995 WL 431326 *6–7 (S.D.N.Y. July 20, 1995) (same); *Morris v. Gilbert*, 649 F.Supp. 1491, 1496–97 (E.D.N.Y.1986) (same).

The Courts that have reached this conclusion have distinguished investors who purchase securities from the ordinary consumer Section 349 is designed to protect. *See Morris*, 649 F.Supp. at 1491; *see also Redtail Leasing*, 1997 WL 603496 *6 *In re Motel 6*, 1995 WL 431326 *6 (noting that courts have been reluctant to apply Section 349 to "transactions that are different in kind and degree from those that confront the average consumer who requires the protection of a state against fraudulent practices"). Indeed, *Black's Law Dictionary* defines "consumer" as "[a] person who buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes." *Black's Law Dictionary 311* (7th ed.1999). As opposed to this definition of "consumer," a purchaser of securities holds the securities as an investment, often with the intent to resell them, and does not consume or use his purchase as he would a traditional "good." Further, in concluding that Section 349 does not apply to securities transactions in *Morris*, Judge Glasser also relied upon the fact that "the securities are subject to pervasive federal regulation, and it is questionable that New York's legislature intended to give securi-

ties investors an added measure of protection beyond that provided by the securities acts and, indeed, RICO." *Morris,* 649 F.Supp. at 1491.

Significantly, the Appellate Divisions that have faced this issue also have found that Section 349 does not apply to securities transactions that are regulated by federal statutes. *See In re Dean Witter Managed Futures Ltd. Partnership Litig.,* 282 A.D.2d 271, 271–72, 724 N.Y.S.2d 149, 150 (1st Dept.2001) ("[T]he cause of action under General Business Law § 349 was correctly dismissed on the ground that federally-regulated securities transactions are outside the scope of that statute."); *Schwarz v. Bear Stearns Companies, Inc.,* 266 A.D.2d 133, 133, 698 N.Y.S.2d 855, 855 (1st Dept.1999) (holding that securities transactions are outside the scope of Section 349); *Smith v. Triad Mfg. Group, Inc.,* 255 A.D.2d 962, 964, 681 N.Y.S.2d 710 (4th Dept.1998).

This Court is bound by these decisions because, when deciding an issue of state law, "the ruling of 'an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Statharos v. New York City Taxi and Limousine Comm'n,* 198 F.3d 317, 321 (2d Cir.1999) (quoting *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). Given that the Court is persuaded by the reasoning of the other district courts within this Circuit that Section 349 does not apply to securities transactions, the Court believes, with reasonable certainty that the Court of Appeals would not decide otherwise. *Statharos,* 198 F.3d at 321.

Based on the foregoing, the Court finds that the federally-regulated securities transactions at issue in this case are out-side the scope of Section 349. As such, the Court grants the motions by Sterling Foster Defendants, the Shalek Defendants, Pace and Novich, the Bear Stearns Defendants, Harriton, Applewoods, and Lasergate to dismiss the Section 349 claims and those claims are dismissed. Furthermore, in light of the Court's finding that as a matter of law, the federally-regulated securities transactions at issue in this case are outside the scope of Section 349, the Court concludes that the Section 349 claim against the Individual Applewoods Defendants and Krasnoff must be dismissed as well, despite the fact that these defendants did not move to dismiss the claims on these grounds. *See Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (holding that a claim "is frivolous when it lacks an arguable basis in either law or fact"); *Fitzgerald v. First East Seventh Street Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (holding that district courts may dismiss frivolous complaints *sua sponte* even when the plaintiff has paid the required filing fee). In sum, claim numbers 25, 26, 27, 28, 29, and 30 are dismissed.

## B. The Motions for a Temporary Stay of the Action Pending Resolution of Parallel Criminal Proceedings

Defendants Pace, Novich, Shalek, and Krasnoff each move for a temporary stay of the action pending resolution of the criminal proceedings that had been brought against them in the Southern District of New York. Just prior to issuing this decision, the Court requested that counsel for Pace, Shalek, and Krasnoff advise the Court as to the current status of the criminal cases against their clients. The Court attempted to contact Novich, who is proceeding *pro se* in this action, but was unable to do so.

The Court has learned that on April 26, 2002, Pace was sentenced before the Hon. Loretta A. Preska in the Southern District of New York. The Court has also been advised that on August 14, 2001, Judge Preska entered an order of *Nolle Prosequi* in the case against Shalek. The Court has been informed that Krasnoff will be sentenced by Judge Preska on July 24, 2002. Although the Court was unable to contact Novich, the Court was able to learn from the Southern District and the Bureau of Prisons, that Novich has been sentenced and is incarcerated.

The recent information provided to the Court regarding the status of the criminal proceedings against Pace, Novich, Shalek, and Krasnoff demonstrate that the criminal proceedings against these defendants have concluded, except for Krasnoff's sentencing. Accordingly, their motions to stay the present action pending the outcome of those criminal proceedings are denied as moot.

## C. The Motion to Lift the Automatic Stay of Discovery

The plaintiffs move for an order lifting the automatic stay of discovery to enable them to subpoena transfer records from Advanced Voice, Applewoods, ML Direct, Com/Tech, and Lasergate which they assert would facilitate the partial settlement with Embryo, Lulkin, Bernstein, Wasserman, and Bernstein & Wasserman. The PSLRA provides for an automatic stay of discovery during the pendency of a motion to dismiss. *See* 15 U.S.C. § 78u–4(b)(3). This decision disposes of the nine motions to dismiss the second amended and consolidated class action complaint. As noted above, concurrently with this decision, the Court is issuing decisions disposing of the motion to dismiss the complaint in *Levitt*, 99 CV 2789, and the two motions to stay, transfer, or dismiss the complaint in *Price*, 98 CV 1470. Accordingly, as of the date of this decision, there are no motions pending in this Multidistrict Litigation. As such, the plaintiffs' motion to lift the automatic stay of discovery is denied as moot.

## III. *CONCLUSION*

Based on the foregoing, it is hereby

**ORDERED**, that the defendants' motions to dismiss the Second Amended Complaint are **GRANTED** and **DENIED** in part as follows:

(1) the claims brought pursuant to Section 12(a)(2) are dismissed;

(2) the claims against the Bear Stearns Defendants and the Individual Applewoods Defendants pursuant to Section 11, Section 10(b), and Rule 10b–5 are dismissed on statute of limitations grounds;

(3) the claims against Harriton pursuant to Section 10(b) and Rule 10b–5 are dismissed for failure to plead scienter with sufficient particularity;

(4) the common law fraud claim against the Bear Stearns Defendants and Harriton is dismissed for failure to plead fraud with sufficient particularity;

(5) the negligent misrepresentation claims against Applewoods, Lasergate, ML Direct, Com/Tech, Shalek, and the IADs are dismissed; and

(6) all of the Section 349 claims are dismissed;

and it is further

**ORDERED**, that the motions by Pace, Novich, Shalek, and Krasnoff to stay the action pending the resolution of the criminal proceedings against them are **DENIED**; and it is further

**ORDERED**, that the motion by the plaintiffs to lift the automatic stay of discovery is **DENIED** as moot; and it is further

ORDERED, that all counsel are directed appear before this Court on Friday, July 26, 2002, at 3:30 p.m. for a status conference addressing, among other things, whether a plaintiffs' steering committee should be appointed; and

ORDERED, that following the conference with this Court, counsel shall proceed directly to the courtroom of United States Magistrate Judge Michael L. Orenstein to set a schedule for discovery.

SO ORDERED.